# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
MANHATTAN DIVISION

| | | |
|---|---|---|
| THE CITY OF NEW YORK, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| | § | |
| | § | |
| MCGRAW MEDIA, INC., JORDAN | § | |
| MCGRAW, BEHIND THE BADGE LLC, | § | |
| AND JOHN AND JANE DOES 1-20, | § | |
| | § | |
| Defendants. | § | |

## APPENDIX OF STATE COURT PLEADINGS

| Ex. No. | Exhibit Name | Bates No. |
|---------|--------------|-----------|
| A-1 | Plaintiff's Original Complaint and Summons | 0001-0029 |
| A-2 | Plaintiff's Proposed Temporary Restraining | 0030-0032 |
| A-3 | Affirmation of Luis Martinez | 0033-0052 |
| A-4 | Plaintiff's Affirmation of Emergency | 0053-0060 |
| A-5 | Plaintiff's Memorandum of Law in Support of TRO | 0061-0084 |
| A-6 | Plaintiff's No Fee Authorization | 0085 |
| A-7 | Plaintiff's Request for Judicial Intervention | 0086-0087 |
| A-8 | Order Granting Temporary Restraining Order | 0088-0090 |

Case 1:26-cv-00598    Document 1-1    Filed 01/22/26    Page 3 of 92

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------X

THE CITY OF NEW YORK,

                         Plaintiff,

             -against-

MCGRAW MEDIA, INC., JORDAN MCGRAW,
BEHIND THE BADGE LLC, and JOHN AND JANE
DOES 1-20,

                      Defendants.

-----------------------------------------------------------------X

**SUMMONS**

Index No.

City File No: 2026-000814

**TO THE ABOVE-NAMED DEFENDANTS:**

         **YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and

to serve a copy of your Answer on the Plaintiff's attorney within 20 days after the service of this

Summons, exclusive of the day of service (or within 30 days after service is completed if this

Summons is not personally delivered to you within the State of New York); and in case of your

failure to appear or answer, judgment will be taken against you by default for the relief demanded

in the Complaint.

         Pursuant to CPLR 501, Plaintiff designates New York County as the place of trial

in accordance with the parties' contract.

Dated:       New York, New York
              January 21, 2026

                         **MURIEL GOODE-TRUFANT**
                         Corporation Counsel of the City of New York
                         100 Church Street, 3rd Floor
                         New York, New York 10007
                         (212) 356-2328/2612

                         By: _Elisa Lee_____
                             Elisa Lee
                             Maxwell Canty-Hilchey (not yet admitted)
                             Assistant Corporation Counsel

# 0001

Case 1:26-cv-00598    Document 1-1    Filed 01/22/26    Page 4 of 92

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------X

THE CITY OF NEW YORK,

                                        Plaintiff,

                    -against-

MCGRAW MEDIA, INC., JORDAN MCGRAW,
BEHIND THE BADGE LLC, and JOHN AND JANE
DOES 1-20,

                                        Defendants.

-----------------------------------------------------------------X

**VERIFIED COMPLAINT**

Index No.

City File No: 2026-000814

The City of New York by its attorney, Muriel Goode-Trufant, Corporation Counsel

of the City of New York, as and for its verified complaint against McGraw Media, Inc., Jordan

McGraw, Behind the Badge LLC, and John and Jane Does 1-20, respectfully alleges as follows:

**PARTIES**

1.      The City of New York (hereinafter referred to as the "City") is a municipal

corporation, duly organized and existing under and by virtue of the laws of the State of New York.

2.      Upon information and belief, McGraw Media, Inc. (hereinafter referred to

as "McGraw Media" or "Producer") is a foreign corporation having its principal place of business

at 4245 Kemp Boulevard, Suite 406, Wichita Falls, Texas 76308-2828.

3.      Upon information and belief, Jordan McGraw ("Mr. McGraw") is the

President of McGraw Media.

4.      Upon information and belief, Behind the Badge LLC is a foreign limited

liability company having its principal place of business at 1400 11th Street, Wichita Falls, Texas

76301, listing Mr. McGraw as its sole Managing Member with his address listed as 4245 Kemp

Boulevard, Suite 406, Wichita Falls, Texas 76308.

0002

Case 1:26-cv-00598    Document 1-1    Filed 01/22/26    Page 5 of 92

5.      John and Jane Doe 1-20 are individuals or entities whose identities and involvement are not yet fully ascertained at this time who may be in possession of or have access or control over the at-issue assets as more fully described herein. The proper parties will be substituted once their identities have been determined.

## JURISDICTION & VENUE

6.      This Court has jurisdiction over this matter pursuant to CPLR 302 because the defendants conducted business in the State of New York by entering into a contract for the provision of certain services within the State of New York.

7.      Venue is proper before the Court under CPLR 501, in accordance with the parties' contract.

8.      This action is commenced within the applicable statute of limitations.

## FACTS

9.      The New York City Police Department (hereinafter referred to as "NYPD" or "Department") is the largest and one of the oldest municipal police departments in the United States.

10.     On or about April 3, 2025, the City, acting by and through its former Chief of Staff to the former Mayor, and McGraw Media, acting by and through its President, Defendant Jordan McGraw ("Mr. McGraw"), entered into a contract (hereinafter referred to as the "Contract") to develop, produce and distribute a potential television and/or digital multi-episode project regarding the NYPD tentatively entitled "Behind the Badge" (hereinafter referred to as the "Project").

11.     The Project was intended to highlight the extraordinary work of the NYPD, and granted Defendants special, behind-the-scenes, exclusive access to film NYPD operations.



3

0003

Given the sensitive nature of the Department's work, the express contractual understanding between the parties was that the City, through the Mayor's Office, would have the opportunity to review rough cuts of the episodes and that certain material, in the reasonable discretion of the City, would not be aired or otherwise disseminated. Now, Defendants have disavowed their obligations to allow the City its say in what material becomes part of the Project, risking immediate and irreparable harm to the City, its employees, and the public at large.

12.     A copy of the Contract is submitted herewith as **Exhibit A**.

13.     The Contract provides the City with the right to review and comment on completed "rough cuts" of episodes such that upon review, the City can, exclusively, in its reasonable discretion, deem content that is "inaccurate, confidential, or that the City is legally prohibited from releasing; that reveal investigatory techniques; or that would otherwise compromise public safety or the public trust" as "Non-Usable Content." The Contract provides that for Non-Usable Content, as identified by the City in writing, McGraw Media will not disseminate it to any person or in any format. (Ex. A, Contract ¶ 6.)

14.     Additionally, the Contract provides that the City can, exclusively, in its reasonable discretion, veto any content from being disseminated if it portrays the City or the NYPD in a negative light. (Ex. A, Contract ¶ 6.)

**At-Issue Assets (Episodes 1 through 18)**

15.     In and around early December 2025, McGraw Media shared four episodes—represented as "rough cuts"—with the City to be reviewed; two were received by the City on about December 8, 2025, and another two were received by the City on or about December 13, 2025.

Case 1:26-cv-00598    Document 1-1    Filed 01/22/26    Page 7 of 92

16.      Upon initial review, it was evident to the City that the episodes, as edited by McGraw Media, were extremely problematic and would violate the parties' Contract if released.

17.      Perhaps of gravest concern, the episodes pose an imminent threat to the life and safety of active NYPD officers. For example, the faces, voices, and names of undercover officers conducting operations in plainclothes are not obscured.

18.      There are numerous other pieces of harmful footage that cannot be released to the public. For example, the identities of individuals in NYPD custody are depicted in the rough cuts without any blurring or redactions applied to their faces.

19.      Additionally, the faces of civilians, who in some cases are likely witnesses and/or victims of crimes, are depicted. None of these individuals consented to be filmed in any capacity in connection with the Project, and appear without any blurring or redactions applied to their faces.

20.      Further, the episodes feature discussions of confidential and sensitive police operations.

21.      All of these issues were promptly raised with the Producer.

22.      The City, acting by and through the Mayor's Office, provided written feedback to Episodes 1 and 2 on December 18, 2025 and to Episodes 3 and 4 on December 26, 2025.

23.      More issues arose when McGraw Media submitted the content purportedly for "episodes" 5 through 18 to the City, in what can be best described as an unedited footage dump on or about December 14, 2025.

24.      These videos were a far cry from "rough cuts."  The video content for "episodes" 5 through eighteen 18 appeared to be submitted by McGraw Media to the City without



5

0005

Case 1:26-cv-00598    Document 1-1    Filed 01/22/26    Page 8 of 92

any edits other than the Producer segmenting raw footage into shorter clips, and none resemble an "episode" in the slightest.

25.     For instance, what purported to be a 42-minute episode provided by McGraw Media to the City featured a 30-minute interview with a single police officer without any edits. In addition, numerous "episodes" contained large segments of footage lacking any audio at all.

26.     Within the footage captured by "episodes" 5 through 18, the content delivered to the City was rife with scenes that constitute Non-Usable Content and otherwise should not be usable pursuant to the Contract.

27.     Any of this footage airing threatens to interfere with law enforcement investigations, judicial proceedings, deprive numerous arrestees' rights to a fair trial, and cause significant harm to the City and the Department as it would undoubtedly tarnish their reputation and goodwill.

28.     The footage from these additional fourteen segments ("episodes" 5 through 18) includes scenes that could actively harm members of the NYPD.

29.     For example, the Producer incorporated footage capturing an NYPD officer inputting the security code to the back door entrance to a precinct station. Encrypted police communications are discussed.  Sensitive and confidential policing techniques are discussed at length.

30.     Pursuant to Paragraph 6 of the Contract, the City agreed to provide comments on content it deemed inappropriate within 10 days of receipt of a "rough cut" of an

episode. Pursuant to Paragraph 6, the City has the right to designate material as Non-Usable Content at any time.[1]

31.     The City submitted comments to McGraw Media within 10 days of receiving "rough cuts" of Episodes 1-4.

32.     The City never received "rough cuts" of episodes 5-18.

33.     Nevertheless, the City submitted comments within 10 business days of receiving raw footage for "episodes" 5-18.

34.     The parties verbally agreed that the City could provide its written comments within ten (10) business days, rather than the 10 days provided in the Contract for any Vetoed Material.

35.     On or about December 31, 2025, the City, through the former Mayor's Office, submitted its written comments to "episodes" 5 through 18 to McGraw Media based on its review of the video footage received flagging portions of the video clips it considered to constitute Non-Usable Content and Vetoed Material.

36.     Yet, despite McGraw Media's agreement to the contrary, the Producer represented that McGraw Media would not accept the designation of Non-Usable Content and Vetoed Material, and intended to publish the material that the City flagged for removal.

37.     Alarmingly, the Producer indicated to the City that it is looking for a buyer of the footage to air the episodes in 2026. Even if the Producer is unsuccessful in finding a buyer, it could self-publish the footage at any time.

---

[1] Paragraph 6 of the Contract also provides the City with the right to veto any portion of the content that portrays the City or the New York City Police Department ("NYPD") in a negative light ("Vetoed Material").

Case 1:26-cv-00598   Document 1-1   Filed 01/22/26   Page 10 of 92

## Termination of the Contract

38.    On or about December 31, 2025, the former Chief of Staff to the Mayor submitted a letter to McGraw Media addressed to Jordan McGraw, exercising the City's right to withdraw from the Contract ("City Withdrawal") pursuant the Contract's terms.

39.    A copy of the letter memorializing the City Withdrawal is submitted herewith as **Exhibit B**.

40.    In summary, the letter details the City's efforts to flag the Non-Usable Content and Vetoed Material, and the Producer's failure to provide a complete rough cut of every episode for review. The letter expressly states that this failure to provide rough cuts "will constitute a breach of the Project Agreement and irreparably harm the City."  (Ex. B.)

41.    Further, the letter notifies McGraw Media that the Mayor's Office invokes Paragraph 19 of the Contract, which pertains to City Withdrawal, and explains that "[Producer] must cease generating any new photographs, footage, recording, or other materials in connection with Behind the Badge."  (Ex. B.)

42.    Paragraph 19 of the Contract also invokes Paragraph 20, which expressly states that the City's rights and the Producer's obligations survive City Withdrawal, including City's rights and Producer's obligations relating to Non-Usable Content and Vetoed Material.  (Ex. A, Contract, ¶¶ 19-20.)

## Contract Provisions At-Issue

43.    Paragraph 6 of the Contract provides the parties' obligations with respect to the Project episodes, including the City's express rights to review and comment on "rough cuts" of episodes, including *inter alia* portions that the City is legally prohibited from releasing or otherwise would compromise public safety or the public trust ("Non-Usable

Content"), and McGraw Media's express agreement to not disseminate those portions determined by the City to be Non-Usable Content.

44.     In relevant part, Paragraph 6 of the Contract states the following about the parties' rights and obligations concerning Non-Usable Content:

> The Producer grants the Mayor's Office the right to review and comment on completed rough cuts of episodes of the Project for purposes of identifying any portions that are inaccurate, confidential, or that the City is legally prohibited from releasing; that reveal investigatory techniques; or that would otherwise compromise public safety or the public trust as exclusively determined by the City in its reasonable discretion ("**Non-Usable Content**"). The Producer agrees not to disseminate to any person or in any format, now known or hereinafter developed, any Non-Usable Content as identified in writing to the Producer by the Mayor's Office.

45.     Paragraph 6 of the Contract also provides the City with the right to veto any portion of the content that portrays the City or the New York City Police Department ("NYPD") in a negative light ("Vetoed Material").

46.     In relevant part, Paragraph 6 of the Contract states the following about the parties' rights and obligations concerning Vetoed Material:

> In consideration of the time-sensitive nature of the Producer's delivery requirements, the Mayor's Office may provide notes regarding substantive segments of an episode and reserves the right to veto any portion of the content that portrays the City or the NYPD in a negative light as exclusively determined by the Mayor's Office in its reasonable discretion within ten (10) days from receipt of an episode.

47.     With the content of the episodes, the City retained the "right of meaningful consultation over creative decisions", and the Producer retained "final creative control over *all other elements* of the Project."  (Ex. A, Contract ¶ 6.)

48.     Similarly, with respect to dissemination of Non-Usable Content and Vetoed Material in promotional materials, Paragraph 9 of the Contract reiterates these obligations:

> The Producer shall submit any promotional materials to the Mayor's Office for approval prior to release. The Producer agrees not to disseminate to any person or in any format, now known or hereinafter developed, any Non-Usable Content identified in writing to the Producer by the Mayor's Office, as part of or in connection with any promotional materials. In consideration of the time-sensitive nature of the Producer's delivery requirements, the Mayor's Office may provide notes regarding substantive segments of any promotional materials and reserves the right to veto any portion of the content that portrays the City or the NYPD in a negative light as exclusively determined by the Mayor's Office in its reasonable discretion within ten (10) days from receipt of same. The Mayor's Office shall have a right of meaningful consultation over creative decisions in connection with the promotional materials, provided that the Producer shall have final creative control over these promotional materials.

49.     In recognition of the need to protect the NYPD's unique reputation for high standards and good will, McGraw Media agreed that "NYPD Property shall not be used in connection with any illegal or immoral purpose or activity, or in any manner which would be inconsistent or damaging to the City's name and reputation. Producer acknowledges that the unauthorized use of NYPD Property will cause irreparable harm to the City for which there is no adequate remedy at law, and that the City shall be entitled to injunctive or other equitable relief restraining such unauthorized use in addition to any other remedies available at law or in equity." (Ex. A, Contract ¶ 11.)

50.     Under Paragraph 14 of the Contract, McGraw Media made the following representations and warrantees and agreed to fully defend, indemnify and hold harmless the City from any third party claims:

> Producer represents and warrants that: (a) Producer has the full right and authority to enter into this agreement, to grant the rights herein granted and to perform Producer's obligations hereunder; (b)

Case 1:26-cv-00598   Document 1-1   Filed 01/22/26   Page 13 of 92

Producer has not made or assumed and shall not hereafter make or assume any commitment, agreement, grant or obligation that shall materially conflict with Producer's obligations hereunder; (c) Producer shall comply with all applicable laws in connection with the Project, NYPD's Property, and Producer's activities under this agreement; and (d) Producer shall use the NYPD Property in accordance with the provisions of this agreement. Without limiting any other defense or indemnification obligation otherwise owed to the City, its officials or employees, Producer shall defend, indemnify and hold harmless the City of New York, including its officials, officers, directors, members, employees, independent contractors, permitted successors, and permitted assignees against any third party claims, liability, loss, damages, costs and expenses (including reasonable outside attorneys' fees and costs) arising out of or in connection with the Producer's breach of its respective representations and warranties in this paragraph.

51. In blatant disregard for the express terms of the Contract, McGraw Media and its principals have failed to provide the City with rough cuts of most episodes, have ignored the City's designations of Non-Usable Content and Vetoed Material, and upon information and belief, they intend to transfer the assets to a third party for their own enrichment. These actions are to the irreparable detriment of the City, the NYPD, its officers, and members of the general public.

## AS AND FOR A FIRST CAUSE OF ACTION
### *Breach of Contract*

52. The City repeats and realleges each and every allegation set forth in paragraphs "1" through "51" as if fully set forth herein.

53. The Contract is a valid and enforceable contract.

54. The City fully performed its obligations under the Contract.

55. With respect to the parties' obligations with the Project episodes, including the City's rights to review and comment and McGraw Media's agreement to not disseminate, paragraph 6 of the Contract states the following:

The Producer grants the Mayor's Office the right to review and comment on completed rough cuts of episodes of the Project for

purposes of identifying any portions that are inaccurate, confidential, or that the City is legally prohibited from releasing; that reveal investigatory techniques; or that would otherwise compromise public safety or the public trust as exclusively determined by the City in its reasonable discretion ("**Non-Usable Content**"). The Producer agrees not to disseminate to any person or in any format, now known or hereinafter developed, any Non-Usable Content as identified in writing to the Producer by the Mayor's Office. In consideration of the time-sensitive nature of the Producer's delivery requirements, the Mayor's Office may provide notes regarding substantive segments of an episode and reserves the right to veto any portion of the content that portrays the City or the NYPD in a negative light as exclusively determined by the Mayor's Office in its reasonable discretion within ten (10) days from receipt of an episode. The Mayor's Office shall have a right of meaningful consultation over creative decisions in connection with the Project, provided that the Producer shall have final creative control over all other elements of the Project. The Producer shall have complete control over all financial and business decisions relating to the Project.

56.     Upon receiving rough cuts of Episodes 1 through 4 and wholly unedited footage relating to "episodes" 5 through 18 (collectively referred to herein as "At-Issue Assets") on or about December 14, 2025, the City reviewed and commented on each and every episode, by time stamp, to identify portions that the City are deemed "Non-Usable Content", namely, inaccurate material, confidential material, and material that the City is legally prohibited from releasing, in addition to other portions that reveal investigatory techniques, and that otherwise compromise the public safety or the public trust.

57.     There is no time limit imposed on the City's right to identify Non-Usable Content.

58.     Under the Contract, the City reserves the exclusive right to determine the content that would be deemed "Non-Usable Content."

Case 1:26-cv-00598    Document 1-1    Filed 01/22/26    Page 15 of 92

59.     Further under the Contract, McGraw Media expressly agrees to "not disseminate to any person or in any format, now known or hereinafter developed, any Non-Usable Content as identified in writing to the Producer by the Mayor's Office."

60.     In addition, the City acting by and through the Mayor's Office expressly reserved the right to veto any portion of the content that portrays the City or the NYPD in a negative light (hereinafter referred to as "Vetoed Material").

61.     Under the Contract, the Mayor's Office could exercise its right to designate Vetoed Material within ten (10) days from the receipt of a "rough cut."

62.     The Mayor's Office never received any material in any format that could be considered "rough cuts" of "episodes" 5 through 18.

63.     Under the Contract, the City acting by and through the Mayor's Office retained the right of meaningful consultation with McGraw Media over creative decisions in connection with the Project.

64.     The City submitted its written comments to the video footage, identifying clips constituting Non-Usable Content and Vetoed Material to the Producer on December 18, 26, and 31, 2025.

65.     Upon information and belief, McGraw Media has breached or intends to breach the Contract by distributing and/or selling the At-Issue Assets without providing the City with rough cuts of episodes beyond Episodes 1-4, and without removing and/or redacting the material identified by the City as Non-Usable Content and Vetoed Material.

66.     By reason of the foregoing, a temporary restraining order, preliminary and permanent injunction are necessary to protect the City from irreparable harm, the City is entitled to a declaratory judgment that Defendants may not release any of the assets to any third party

without the City's approval, and Defendants are liable to the City for the breaches of the Contract in the amount to be ascertained at trial, plus applicable interest.

### AS AND FOR A SECOND CAUSE OF ACTION
### *Indemnification*

67.      The City repeats and realleges each and every allegation set forth in paragraphs "1" through "66" as if fully set forth herein.

68.      Under the Contract, McGraw Media agreed to fully indemnify and hold harmless the City for any and all claims arising out of the Project, including its own breach of representations and warranties with respect to complying with applicable laws in connection with the Project. (Ex. A, Contract ¶ 14.)

69.      Paragraphs 2 and 14 of the Contract set forth McGraw Media's indemnification obligations as follows:

> 2. … The Producer shall hold the City, and its successors, assigns, employees and agents, harmless from any claims, judgments, awards, debts, expenses, damages, executor's claims, demands, and attorney's fees and costs assessed against the City, its successors, assigns, employees and agents arising out of the Project. …
>
> * * * *
>
> 14.  Producer represents and warrants that … (b) Producer has not made or assumed and shall not hereafter make or assume any commitment, agreement, grant or obligation that shall materially conflict with Producer's obligations hereunder; (c) Producer shall comply with all applicable laws in connection with the Project, NYPD's Property, and Producer's activities under this agreement … Without limiting any other defense or indemnification obligation otherwise owed to the City, its officials or employees, Producer shall defend, indemnify and hold harmless the City of New York, including its officials, officers, directors, members, employees, independent contractors, permitted successors, and permitted assignees against any third party claims, liability, loss, damages, costs and expenses (including reasonable outside attorneys' fees and costs) arising out of or in connection with the Producer's breach of its respective representations and warranties in this paragraph.

70.     Under the Contract, Defendants have agreed to fully indemnify the City for any and all potential claims that can arise out of a breach of the City's statutory obligations to keep out of the public domain certain information that could be released in connection with the Project and against the City's raised objections.

71.     Paragraph 14(c) confers an obligation by the Producer to comply with all applicable laws, which include legal rules that bar the release of certain information to the public or require redactions before information can be released.

72.     For instance, Public Officers Law § 87(2)(b) allows the City to deny the public access to records, or portions thereof that would constitute "an unwarranted invasion of personal privacy under [Public Officers Law § 89(2), which governs access to law enforcement personnel records.]"[2]

73.     Additionally, Public Officers Law § 87(2)(e) allows the City to deny the public access to records, or portions thereof that would "interfere with law enforcement investigations or judicial proceedings, deprive a person of a right to a fair trial or impartial adjudication, identify a confidential source or disclose confidential information relating to a criminal investigation, or reveal criminal investigative techniques and procedures."[3]

74.     Moreover, Public Officers Law § 87(2)(e) allows the City to deny the public access to records, or portions thereof that, "if disclosed could endanger the life or safety of any person."[4]

---

[2] Public Officers Law § 87(2)(b); *see also* Civil Rights Law § 50-a(1).

[3] Public Officers Law § 87(2)(e).

[4] Public Officers Law § 87(2)(f).

75.     Further, Public Officers Law § 87(2)(a) allows the City to deny the public access to records, or portions thereof that are "specifically exempted from disclosure by state or federal statue[.]"[5]

76.     Accordingly, a declaratory judgment should be entered finding that, in the event that a claim is asserted or threatened to be asserted against the City, McGraw Media and/or its assigns must fully indemnify the City and hold the City harmless from any claims, judgments, awards, debts, expenses, damages, executor's claims, demands, and attorney's fees and costs that can be assessed against the City.

<div align="center">

**AS AND FOR A THIRD CAUSE OF ACTION**
***Trademark Infringement & Dilution by Tarnishment Under the Lanham Act & N.Y. State Unfair Competition Laws***

</div>

77.     The City repeats and realleges each and every allegation set forth in paragraphs "1" through "76" as if fully set forth herein.

78.     The City holds trademark assets in the name, trademarks, and logos of the NYPD (the "NYPD Marks"), which is world-renowned as one of the best and largest police forces in the world.

79.     The City's ownership over the NYPD Marks is recognized in the Contract, at Paragraph 9, and as such, Defendants have actual knowledge of the City's ownership interests in the Marks.

80.     Among others, the City owns a trademark in the word "NYPD", registered with the U.S. Patent & Trademark Office ("USPTO") under Registration Number 3014363, and a

---

[5] These would include categories of information that would require specific authorization by a third party for release of any portion thereof, including, for example such information that is protected by HIPAA (Health Insurance Portability and Accountability Act) and the Criminal Procedure Law § 160.50.

<div align="center">

16

0016

</div>

trademark for the "Police Department City of New York", registered with the USPTO under Registration Number 3061459.

81. Although the Contract granted a license for McGraw Media to "use, distribute, promote, and exhibit the NYPD name and approved trademarks and logos" in connection with the Project, such license was granted expressly in contemplation of compliance with the Contract. (Ex. A, Contract ¶¶ 9-10.)

82. McGraw Media is therefore not authorized to use the NYPD Marks where it fails to comply with the terms of the limited license contained in the Contract.

83. McGraw Media has expressed an intent to distribute the assets in violation of the very terms of the Contract intended to protect the integrity of the NYPD Marks.

84. Under paragraphs 9 and 10, the Producer agreed *inter alia* "not to make any disparaging use of NYPD Property, or use the NYPD Property outside the purposes of this agreement … , or to in any way tarnish or blur the distinctive nature of the NYPD Property" and the City was given the right to "veto any portion of the content that portrays the City or the NYPD in an negative light as exclusively determined by the Mayor's Office" as well as "a right of meaningful consultation over creative decisions in connection with the promotional materials". (Ex. A, Contract ¶¶ 9-10.)

85. The content that McGraw Media intends to distribute contains depictions of the NYPD Marks through its filming of NYPD officers, which were expressly disapproved and vetoed by the City as it portrays the City and NYPD in a negative light, and if released, would tarnish the reputation of the City and the NYPD.

86. In the Contract, the Producer recognized "that NYPD Property communicates to the public, world-wide, a reputation for high standards, which reputation and

goodwill have been and continue to be unique to the City" and that "the unauthorized use of NYPD Property will cause irreparable harm to the City for which there is no adequate remedy at law." (Contract ¶ 11.)

87. The Producer exceeded the scope of its license when it refused to remove the content the City flagged as Non-Usable Material and Vetoed Material.

88. If released in its current form without the City's edits, viewers would be misled into believing that the video content has been approved by NYPD and the City.

89. Upon information and belief, McGraw Media intends to distribute this material without the City's edits for its own financial gain, to exploit the limited license granted to it by the City, and all at the cost and expense of irreparable harm to the City and NYPD's reputation.

90. Such distribution would likely lead to a deceptive inference by viewers and consumers that the City and NYPD had creative involvement in the production of the Project, when in fact, the City's input in the Project have been ignored, in contravention of the Contract.

91. Accordingly, Defendants' use of the NYPD Marks in excess of the license are likely to cause confusion, mistake, or deception on the part of consumers as to the source, nature and quality of the programming that Defendants distribute, constituting trademark infringement in violation of the Lanham Act, at 15 U.S.C. § 1114 and/or 15 U.S.C. § 1125(a).

92. Likewise, this type of harm is protected by state law trademark dilution statutes entitling a plaintiff to injunctive relief. *See* N.Y. Gen. Bus. Law § 360-l ("Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered … , notwithstanding

the absence of competition between the parties or the absence of confusion as to the source of goods or services.)

93.     NYPD's reputation for protecting its officers, employees, and members of the public would be irreparably harmed by the distribution of the Project in its current form. Distribution of the Project in this form would jeopardize not only the safety of NYPD officers and their abilities to carry out their duties, but violate basic tenets of decency and public policy, and such atrocious and malicious publication would be wrongfully attributed to the NYPD.

94.     The City will be irreparably injured and damaged by Defendants' conduct, and unless a temporary restraining order, preliminary and permanent injunction are entered by the Court as authorized by 15 U.S.C. § 1116, the City and the NYPD will sustain further harm to their names, reputations, and good will.

95.     To the extent Defendants have or will profit from the improper use of the NYPD Marks, the City should be awarded to proceeds of any such profits.

96.     Defendants' blatant refusal to abide by the terms of the Contract and bounds of the license for its use of the NYPD Marks constitutes a willful violation, and the City should be awarded treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

### AS AND FOR A FOURTH CAUSE OF ACTION
### *Declaratory and Injunctive Relief*

97.     The City repeats and realleges each and every allegation contained in paragraphs "1" through "96" as if fully set forth herein.

98.     As a result of the Defendants' refusal to meaningfully consult with the City and Defendants' expressed intent to sell the at-issue footage, which includes Non-Usable Content and Vetoed Material, as identified and flagged by the City, there is a justiciable dispute as to McGraw Media's obligations to not disseminate any and/or all of the At-Issue Assets.

99.    If Defendants sell the At-Issue Assets to a third-party, or otherwise disseminate such footage without the redactions and removals requested by the City, the City and the public will suffer irreparable harm because the information, if made public, would compromise the life and safety of persons who were captured on film during the course of the Project and/or cause irreparable reputational harm.

100.    Of note, McGraw Media has specifically acknowledged such irreparable harm that would befall the City in the event that there is unauthorized use of NYPD Property, which includes "in any manner which would be inconsistent or damaging to the City's name and reputation" under paragraph 11 of the Contract.  It expressly states, "Producer acknowledges that the unauthorized use of NYPD Property *will cause irreparable harm to the City for which there is no adequate remedy at law, and that the City shall be entitled to injunctive or other equitable relief restraining such unauthorized use* in addition to any other remedies available at law or in equity." (emphasis added)

101.    The City respectfully requests that, consistent with the parties' stated obligations under the Contract and the governing law which prohibits the City from releasing Non-Usable Content, the Court enjoin McGraw Media from selling and/or disseminating and/or otherwise disposing of any portion of the Project in its current form and without further consultation with the City.

102.    To the extent McGraw Media intends to sell or is in the process of selling or has already completed the sale of the At-Issue Assets without written consent of the City, the Contract expressly prohibits such a transfer. (Ex. A, Contract ¶ 13.)  Under Paragraph 13 of the Contract, it is expressly agreed that "Any attempt to assign, transfer, or delegate without such [written] consent shall be void."

103.     The City further respectfully requests that the Court declare that any sale or transfer of assets, including the At-Issue Assets, void.

104.     The issuance of prompt declaratory relief by this Court is desirable and necessary to resolve the existing controversy between the parties.

### REQUEST FOR RELIEF

**WHEREFORE**, the City demands judgment against the Defendants as follows:

(1)     Judgment against Defendants on Plaintiff's Causes of Action;

(2)     Injunctive relief prohibiting Defendants from taking any action concerning the At-Issue Assets, including their sale, distribution, or dissemination;

(3)     Declaratory relief adjudging any transfer of the At-Issue Assets to be void;

(4)     Ordering Defendants to fully indemnify the City for any and all claims asserted against the City arising out of the Project by any party;

(5)     Punitive damages in amounts to be determined at trial;

(6)     Compensatory and/or restitution damages in amounts to be determined at trial;

(7)     Awarding reasonable expenses, attorneys' fees and costs; and

(8)     Any such other and further relief as this Court deems just and proper.

Dated:      New York, New York
             January 21, 2026

**MURIEL GOODE-TRUFANT**
Corporation Counsel of the City of New York
*Attorney for Plaintiff*
100 Church Street, 3rd Floor
New York, New York 10007
(212) 356-2328/2612

By: _____
       Elisa Lee
       Maxwell Canty-Hilchey (not yet admitted)
       Assistant Corporation Counsel

Case 1:26-cv-00598    Document 1-1    Filed 01/22/26    Page 25 of 92

## VERIFICATION

I, Luis Martinez, am a Senior Advisor at the New York City Police Department ("NYPD"). I have read the foregoing Complaint and I know that the contents thereof are true to my own knowledge based upon information obtained from the books and records of the City and from statements made to me by present and former employees, officers or agents of the City, except as to those matters alleged on information and belief, and as to those matters, I believe them to be true.

I affirm this 21st day of January, 2026, under penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

LUIS MARTINEZ

Case 1:26-cv-00598    Document 1-1    Filed 01/22/26    Page 26 of 92

Project Agreement
between
The City of New York
And
McGraw Media, Inc.

This agreement ("Agreement") entered into on April 3, 2025, confirms our understanding of the conditions under which McGraw Media, Inc. (the "**Producer**") will develop, produce and distribute a potential television and/or digital project tentatively entitled "Behind the Badge" (the "**Project**") with the cooperation of the City of New York (the "**City**") by and through its agency the New York City Mayor's Office (the "**Mayor's Office**").

1. During the period commencing as of the date hereof and continuing for three (3) years (the "**Term**"), the Producer shall have the exclusive right to develop, produce, and distribute the Project. The Term may be extended upon the mutual written agreement of the parties.

2. The Project will consist of up to 17 episodes per year and the Producer shall be responsible for all development, production and distribution of the Project and all costs and expenses related to, or arising out of, the Project. The Producer shall not seek reimbursement or compensation from the City, or its employees, agents, contractors, or assigns for any cost or expense related to, or arising out of, the Project. The Producer shall hold the City, and its successors, assigns, employees and agents, harmless from any claims, judgments, awards, debts, expenses, damages, executor's claims, demands, and attorney's fees and costs assessed against the City, its successors, assigns, employees and agents arising out of the Project. The Producer agrees that any individual working on the Producer's behalf, whether as an employee, contractor, or otherwise, in connection with the Project will sign a release, reviewed and approved by the City, releasing the City from liability and payment to the full extent of the releases by the Producer contained in this paragraph. The parties acknowledge and agree that neither the City nor any City personnel will be compensated by the Producer for any time, effort or other cooperation expended for the Project.

3. The Producer acknowledges that its primary point of contact for this Project is the Chief of Staff to the Mayor (the "**Chief of Staff**") within the Mayor's Office. To the extent the Producer wishes to contact the New York City Police Department ("**NYPD**"), or other City personnel in connection with the Project, or to otherwise photograph, film, or record at a location within the control of the City, the Producer must first receive authorization from the Chief of Staff. The parties will work in good faith to ensure that there is no unnecessary delay in communications between the parties.

4. During the Term, and as may be reasonably requested by the Producer, the City agrees to provide the Producer with (i) access to City personnel, including but not limited to police officer(s), and the situations they encounter; and (ii) as practicable, the right to photograph, film and record the NYPD and agreed upon locations within the NYPD's control, for the sole purposes of the Project in accordance with the terms herein. The Producer agrees that it will not interfere with any City personnel's regular work obligations, and that it will at all times obey the commands and

0024

DocuSign Envelope ID: 17EC7AB8-DF1B-44A1-8E81-3EF5C3A20F7E
Case 1:26-cv-00598    Document 1-1    Filed 01/22/26    Page 27 of 92

directions of any City personnel for health, safety, security or operational reasons. The Producer shall work collaboratively with the Chief of Staff who will accordingly coordinate with the NYPD to determine which NYPD personnel and locations the Producer wishes to photograph, film or record. The Producer acknowledges that there may be certain NYPD personnel and NYPD locations that the Mayor's Office, at its sole discretion, or in collaboration with the NYPD, will not make available for use in the Project.

5. The Producer will be responsible for securing all consents, releases and permits necessary to effect the development, production and distribution of the Project, except for any consents or releases from NYPD personnel. The Producer agrees not to secure consents or releases from NYPD personnel. Rather, the NYPD, through representatives at the Mayor's Office, will secure any necessary consents and releases from its personnel. The Producer acknowledges that some NYPD personnel may refuse to be filmed and that the City has no obligation to compel such personnel to participate in the Project. The Producer shall make any consent or release forms available to the City for review and approval prior to use.

6. The Producer grants the Mayor's Office the right to review and comment on completed rough cuts of episodes of the Project for purposes of identifying any portions that are inaccurate, confidential, or that the City is legally prohibited from releasing; that reveal investigatory techniques; or that would otherwise compromise public safety or the public trust as exclusively determined by the City in its reasonable discretion ("**Non-Usable Content**"). The Producer agrees not to disseminate to any person or in any format, now known or hereinafter developed, any Non-Usable Content as identified in writing to the Producer by the Mayor's Office. In consideration of the time-sensitive nature of the Producer's delivery requirements, the Mayor's Office may provide notes regarding substantive segments of an episode and reserves the right to veto any portion of the content that portrays the City or the NYPD in a negative light as exclusively determined by the Mayor's Office in its reasonable discretion within ten (10) days from receipt of an episode. The Mayor's Office shall have a right of meaningful consultation over creative decisions in connection with the Project, provided that the Producer shall have final creative control over all other elements of the Project. The Producer shall have complete control over all financial and business decisions relating to the Project.

7. The Producer agrees to provide the Mayor's Office with copies of each episode of the Project and any and all video and audio content related to the Project, including, without limitation, all deleted scenes, b-roll, and unused footage, in a time frame that will allow the NYPD to meet any and all discovery obligations.

8. The Producer shall exclusively own all now known or hereafter existing right, title and interest of every kind throughout the universe, in perpetuity and in all languages, in and to the Project and all elements therein, for all uses, forms and media now known or hereafter devised. Except for rights provided to the City in this agreement, the City waives any and all rights that the City or its personnel may have or claim to have in the Project. To the extent any rights related to the Project are not automatically owned by the Producer upon creation, to the extent the City has any rights in the Project, it hereby irrevocably assigns, transfers and conveys to the Producer, for no

DocuSign Envelope ID: 17CA84DF-2EC4-4E33-AEB4-B93A1BA7EF9C
Case 1:26-cv-00598    Document 1-1    Filed 01/22/26    Page 28 of 92

additional consideration, any such rights, and hereby waives all moral and other rights in and to the Project and any element thereof. The Producer agrees that any material created for the Project in any format, now known or hereinafter developed, shall be used exclusively for the Project and for no other purpose whatsoever.

9.  The City hereby grants to the Producer a worldwide, royalty-free and nonexclusive right and license to use, distribute, promote, and exhibit the NYPD name and approved trademarks and logos (the "**NYPD Property**"), in perpetuity, solely in connection with the Project, and each episode and element thereof, and in advertising, promotion and publicity in connection with the Project and, in connection therewith, the exhibitors and sponsors thereof. The Producer shall submit any promotional materials to the Mayor's Office for approval prior to release. The Producer agrees not to disseminate to any person or in any format, now known or hereinafter developed, any Non-Usable Content identified in writing to the Producer by the Mayor's Office, as part of or in connection with any promotional materials. In consideration of the time-sensitive nature of the Producer's delivery requirements, the Mayor's Office may provide notes regarding substantive segments of any promotional materials and reserves the right to veto any portion of the content that portrays the City or the NYPD in a negative light as exclusively determined by the Mayor's Office in its reasonable discretion within ten (10) days from receipt of same. The Mayor's Office shall have a right of meaningful consultation over creative decisions in connection with the promotional materials, provided that the Producer shall have final creative control over these promotional materials.

10.  The parties agree that the NYPD Property is and shall remain exclusively the property of the City of New York acting by and through the NYPD. Producer further agrees: (i) not to make any disparaging use of NYPD Property, or use the NYPD Property outside the purposes of this agreement (except as permitted by a separate agreement), or to in any way tarnish or blur the distinctive nature of the NYPD Property, and (ii) not to register or attempt to register any NYPD Property (or any potentially similar name or trademark) as or part of a trademark, service mark, logo, slogan or Internet domain name. The NYPD Property may be used only in the exact form, style and type as approved in writing by the NYPD, and in accordance with its brand identity guidelines made available to the Producer in writing, provided that any such approval shall not be unreasonably withheld, conditioned or delayed. All use of the NYPD Property by Producer is subject to prior review and written approval of the City as set forth in this agreement, provided that any such approval shall not be unreasonably withheld, conditioned or delayed. Producer further agrees to include legal and proper ownership and/or registration notices in connection with any and all uses of NYPD Property in accordance with the reasonable requests of the NYPD.

11.  Producer recognizes that NYPD Property communicates to the public, world-wide, a reputation for high standards, which reputation and goodwill have been and continue to be unique to the City. Therefore, the NYPD Property shall not be used in connection with any illegal or immoral purpose or activity, or in any manner which would be inconsistent or damaging to the City's name and reputation. Producer acknowledges that the unauthorized use of NYPD Property will cause irreparable harm to the City for which there is no adequate remedy at law, and that the City shall

Case 1:26-cv-00598    Document 1-1    Filed 01/22/26    Page 29 of 92

be entitled to injunctive or other equitable relief restraining such unauthorized use in addition to any other remedies available at law or in equity.

12. The Producer agrees to use good faith efforts to respond to any requests for footage from the Mayor's Office. If the Producer is compelled to disclose any footage from the Project by judicial or administrative process or other legal requirement, the Producer agrees to promptly notify the Mayor's Office (to the extent legally permitted) and reasonably cooperate with the Mayor's Office to the full extent of the law.

13. This agreement shall inure not only to the Producer's benefit but also to the benefit of all parties who may hereafter acquire the right to distribute, exhibit, advertise and/or exploit the Project or any portion thereof. No party may assign this agreement in whole or in part or any rights granted herein without written consent of the other party, except as provided for elsewhere in this agreement. Any attempt to assign, transfer, or delegate without such consent shall be void.

14. Producer represents and warrants that: (a) Producer has the full right and authority to enter into this agreement, to grant the rights herein granted and to perform Producer's obligations hereunder; (b) Producer has not made or assumed and shall not hereafter make or assume any commitment, agreement, grant or obligation that shall materially conflict with Producer's obligations hereunder; (c) Producer shall comply with all applicable laws in connection with the Project, NYPD's Property, and Producer's activities under this agreement; and (d) Producer shall use the NYPD Property in accordance with the provisions of this agreement. Without limiting any other defense or indemnification obligation otherwise owed to the City, its officials or employees, Producer shall defend, indemnify and hold harmless the City of New York, including its officials, officers, directors, members, employees, independent contractors, permitted successors, and permitted assignees against any third party claims, liability, loss, damages, costs and expenses (including reasonable outside attorneys' fees and costs) arising out of or in connection with the Producer's breach of its respective representations and warranties in this paragraph.

15. Either party may terminate this agreement upon written notice to the other party if the other party fails to cure any material breach of this agreement within (30) days after receipt of written notice of such breach. Neither party shall have any financial obligations to the other party upon termination. In the event of termination under this paragraph, the Producer will cease generating any additional photographs, footage, recording, or other materials in connection with the Project, and the terms in Section 20 shall apply.

16. In the event that NYPD Property is being used by Producer in any way which, in the reasonable judgment of the Mayor's Office, is inconsistent with or damaging to the NYPD's name or reputation, the Mayor's Office may notify Producer in writing that this agreement will be terminated immediately unless Producer ceases and halts all such uses immediately. In the event of termination under this paragraph, the Producer will cease generating any additional photographs, footage, recording, or other materials in connection with the Project and the terms in Section 20 shall apply.

17. This agreement shall be deemed to be executed in the City and State of New York, regardless of the domicile of the Producer, and shall be governed by and construed in accordance with the Laws of the State of New York (notwithstanding New York choice of law or conflict of law principles) and the Laws of the United States, where applicable. The parties agree that any and all claims asserted by or against the NYPD arising under or related to this agreement shall solely be heard and determined either in the courts of the United States located in the City and County of New York or in the courts of the State located in the City and County of New York.

18. The Producer and the Mayor's Office shall mutually agree upon a press release announcing the Project and any press or media plans related to the Project, as set forth herein. The Producer and the Mayor's Office shall have mutual approval over the content of such press release and any press or media plans related to the Project.

19. On or before December 31, 2025, the parties shall meet and confer to discuss progress made on the Project and assess the current state of the relationship between the parties. At such time, if the Mayor's Office determines in good faith that the City is no longer able to fulfill its obligations under this agreement, including Section 4 (the "**City Withdrawal**"), the Producer agrees to cease generating any new photographs, footage, recording, or other materials in connection with the Project and the terms in Section 20 shall apply.

20. Upon the expiration or termination of this agreement, or in the event of a City Withdrawal, any provision of this agreement, which, by its nature would survive expiration, termination or a City Withdrawal, will survive, including, without limitation, the NYPD's rights and the Producer's obligations under Sections 6 and 7 of this agreement.  For the avoidance of doubt, in no event will the expiration or termination of this agreement, or any City Withdrawal, prevent the Producer from continuing to develop, produce, and distribute any existing photographs, footage, recording, or other materials generated in cooperation with the City in connection with the Project prior to the date of such expiration, termination or City Withdrawal, in accordance with the terms herein.

Accepted and Agreed:

MCGRAW MEDIA, INC.

_____
Jordan McGraw, President
McGraw Media, Inc.

THE CITY OF NEW YORK

_____
Camille Joseph Varlack
Chief of Staff to the Mayor

0028



THE CITY OF NEW YORK
OFFICE OF THE MAYOR
NEW YORK, NY 10007

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**

December 31, 2025

Jordan,

As you are aware, the Mayor's Office provided you with written feedback on rough cuts of Episodes 1 & 2 of Behind the Badge on December 18, 2025, and rough cuts of Episodes 3 & 4 of Behind the Badge on December 26, 2025. Earlier today, the Mayor's Office provided you with written feedback on what you have represented to be rough cuts of episodes 5-18, all of which were simultaneously provided to the City. In many instances these are plainly not rough cuts of episodes at all, but rather large blocks of raw footage and unedited segments. Pursuant to Paragraph 6 of the April 3, 2025 Project Agreement between The City of New York & McGraw Media Inc. (the "Project Agreement"), the Mayor's Office has a right to review a completed rough cut of each episode. Failure to provide the Mayor's Office with a completed rough cut of each episode for review will constitute a breach of the Project Agreement and irreparably harm the City.

To be clear, each of the video clips that we have flagged in our feedback on [12/18/2025, 12/26/2025, and 12/31/2025] constitutes Non-Usable Content as determined by the City in its reasonable discretion under Paragraph 6 of the Project Agreement and accordingly cannot be disseminated by you to any person in any format. The Mayor's Office is also exercising its right to veto the content in each of those clips pursuant to Paragraph 6 of the Project Agreement because it portrays the City and the NYPD in a negative light as exclusively determined by the Mayor's Office in its reasonable discretion. Airing any of these clips would violate the Project Agreement and irreparably harm the City.

Pursuant to Paragraph 19 of the Project Agreement, the Mayor's Office has determined in good faith that the City is no longer able to fulfill its obligations under the Project Agreement. Accordingly, you must cease generating any new photographs, footage, recording, or other materials in connection with Behind the Badge.

The City reserves all its rights.

Camille Joseph Varlack
Deputy Mayor for Administration, Chief of Staff, and Special Counsel
Office of the Mayor, City of New York

0029

At Part ____ of the Supreme Court of the County of New York, held at 60 Centre Street at the Supreme Courthouse in the City of New York, New York, on the ____ day of January, 2026.

PRESENT: Hon. _____, Justice

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------ X
THE CITY OF NEW YORK,

<div align="center">Plaintiff,</div>

        -against-

MCGRAW MEDIA, INC., JORDAN MCGRAW, BEHIND THE BADGE LLC, and JOHN AND JANE DOES 1-20,

<div align="center">Defendants.</div>

------------------------------------------------------------------ X

**[PROPOSED] ORDER WITH TEMPORARY RESTRAINING ORDER**

Index No.

      **UPON** the reading and filing of the accompanying affirmation of Elisa Lee, an Assistant Corporation Counsel (the "Lee Affirmation") and Affidavit of Luis Martinez, Special Advisor to the Commissioner of the New York City Police Department ("NYPD") (the "Martinez Affidavit"), and memorandum of law in support, together with all the supporting papers annexed hereto, and upon all the prior papers and proceedings in this action,

      **LET** the above named Defendants or their attorneys, **SHOW CAUSE** at a term, IAS Part _____ Room _____, to be held at the Courthouse, 60 Centre Street, New York, New York 10007, on the _____ day of _____, 2026, at ____ o'clock of that day or as soon thereafter as counsel can be heard,

      **WHY** an Order should not be made:

<div align="center">

0030

</div>

1. Preliminarily enjoining Defendants and anyone acting on their behalf from transferring, selling, disposing of, or in any way disseminating and/or distributing any video footage pertaining to the digital project entitled "Behind the Badge" (the "Project") involving numerous members of service of the NYPD without first removing the Non-Usable Content and Vetoed Material as identified by the City; and

2. Pursuant to 22 NYCRR § 216.1, ordering that future filings by any party in the above-captioned action to the extent they contain, describe or otherwise reference Non-Usable Content or Vetoed Material as described in the Contract be redacted and/or filed under seal; and it is further

**ORDERED** that pending the hearing of this motion, that Defendants and anyone acting on their behalf are temporarily **STAYED** and **RESTRAINED** from acting in any way to transfer and/or sell and/or distribute and/or disseminate video footage pertaining to the Project without first removing the Non-Usable Content and Vetoed Material as identified by the City;

**FURTHER ORDERED** that pending the hearing of this motion, that parties seeking to submit the video footage and any descriptions or references of Non-Usable Content or Vetoed Material as previously identified by the City to the Court shall redact such information or submit it under seal; and

**SUFFICIENT REASONING APPEARING THEREFORE**, let service of a copy of this Order to Show Cause, together with the papers upon which it is based, be made upon Defendants by overnight mail on or before _____ ____, 2026; and it is further

**ORDERED** that all answering papers, if any, shall be served on the Office of the Corporation Counsel, 100 Church Street, 3rd Floor, New York, New York 10007, with a copy to

the Court so as to be received by said attorneys on or before _____ ____, 2026.

Reply papers shall be served on or before _____, 2026.

E N T E R

_____
Justice

FILED: NEW YORK COUNTY CLERK 01/21/2026 03:35 PM
NYSCEF DOC. NO. 5

Case 1:26-cv-00598    Document 1-1    Filed 01/22/26    Page 35 of 92

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------------x

THE CITY OF NEW YORK,

                                 Plaintiff,

               -against-

MCGRAW MEDIA, INC., JORDAN MCGRAW,
BEHIND THE BADGE LLC, and JOHN AND JANE
DOES 1-20,

                                Defendants.

------------------------------------------------------------------------x

**AFFIRMATION OF LUIS MARTINEZ IN SUPPORT PLAINTIFF'S REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Index No.

City File No: 2026-000814

1.     I, Luis Martinez, am currently employed by the New York City Police Department ("NYPD"), and hold the position of Senior Advisor in the Police Commissioner's Office. I have held this position since 2026.

2.     In September 2024, I was assigned as the Senior Advisor to the Chief of Staff in the New York City Mayor's Office (the "Mayor's Office"), an office of the City of New York (the "City"). I returned to NYPD in my current role at the beginning of 2026.

3.     The facts stated in this affirmation are based on my personal knowledge, on conversations I have had with other City personnel, and on my review of files maintained by the NYPD, the Mayor's Office, and its representatives.

**Preliminary Statement**

4.     Undercover identities, faces and identities of arrestees, juveniles, crime victims and witnesses, and sensitive police operations information are all among the materials contained in the video footage in Defendants' possession. The City believes that Defendants intend to release such video footage in its current form, which would have devastating consequences to both the individuals depicted and to the City. Pursuant to an agreement between Defendants and the City,

0033

"Behind the Badge" was planned to be a television show depicting the work of the NYPD. But Defendants have failed to honor their end of the bargain, and have ignored the City's contractually-mandated edits, threatening the safety and privacy of numerous individuals and police officers. Therefore, Defendants, and those acting on their behalf, must be enjoined from transferring, selling, disposing of, or in any way disseminating and/or distributing any video footage pertaining to the digital project entitled "Behind the Badge."

**Background**

5.    The New York City Police Department (hereinafter referred to as "NYPD" or "Department") is the largest and one of the oldest municipal police departments in the United States.

6.    On or about April 3, 2025, the City, acting by and through the Mayor's Office, and McGraw Media, Inc. (hereinafter referred to as "the Producer" or "McGraw Media"), acting by and through its President, Defendant Jordan McGraw ("Mr. McGraw"), entered into a contract (hereinafter referred to as the "Contract") to develop, produce and distribute a potential television and/or digital project tentatively entitled "Behind the Badge" (hereinafter referred to as the "Project").

7.    A copy of the Contract is attached hereto as **Exhibit A**.

8.    The Project was intended to highlight the extraordinary work of the NYPD, and granted Defendants special, behind-the-scenes, exclusive access to film NYPD's operations with the express understanding between the parties that certain footage would not be fit for production or disclosure to anyone due to the sensitive nature of the work of the NYPD.

9.    The Contract provides that the Producer would not interfere with any City personnel's regular work obligations and that it would at all times obey the commands and

directions of any City personnel for health, safety, security or operational reasons. The Producer further agreed to work collaboratively with the Mayor's Chief of Staff and acknowledged that there may be certain NYPD personnel and NYPD locations that the Mayor's Office, at its sole discretion, or in collaboration with the NYPD, would not make available for use in the Project. (Ex. A, Contract ¶ 4.)

10.     The Contract provides the City with the right to review and comment on completed rough cuts of episodes such that upon review, the City can, exclusively, in its reasonable discretion, deem content that is "inaccurate, confidential, or that the City is legally prohibited from releasing; that reveal investigatory techniques; or that would otherwise compromise public safety or the public trust" as "Non-Usable Content."  (Ex. A, Contract ¶ 6.)

11.     The Contract provides that McGraw Media may not disseminate to any person in any format content deemed "Non-Usable". (Ex. A, Contract ¶ 6.)

12.     The Contract further provides that the City can, exclusively, in its reasonable discretion, veto any content from being disseminated where it portrays the City or the NYPD in a negative light.  (Ex. A, Contract ¶ 6.)

13.     The Contract stipulates that any material created for the Project in any format, now known or hereinafter developed, shall be used exclusively for the Project and for no other purpose whatsoever. (Ex. A, Contract ¶ 8.)

14.     Under the Contract, the City granted the Producer a license to use, distribute, promote, and exhibit the NYPD name and approved trademarks and logos (hereinafter referred to as the "NYPD Property"), solely in connection with the Project. Accordingly, the Producer agreed not to disseminate to any person or in any format, now known or hereinafter

0035

developed, any Non-Usable Content identified in writing to the Producer by the City, as part of or in connection with any promotional materials. (Ex. A, Contract ¶ 9.)

15.     The Contract stipulates that the City may provide notes regarding substantive segments of any promotional materials and reserves the right to veto any portion of the content that portrays the City or the NYPD in a negative light as exclusively determined by the City in its reasonable discretion within ten (10) days of same. (Ex. A, Contract ¶ 9.)

16.     The Contract stipulates that the City shall have a right of meaningful consultation over creative decisions in connection with the promotional materials. (Ex. A, Contract ¶ 9.)

17.     The Producer agrees that the NYPD Property is and shall remain exclusively the property of the City of New York. (Ex. A, Contract ¶ 10.)

18.     The Producer further agrees to not make disparaging use of NYPD property or use NYPD Property outside the purposes of the Contract or to in any way tarnish or blur the distinctive nature of the NYPD Property and further agrees that the NYPD Property may be used only in the exact form, style and type as approved in writing by the NYPD.  (Ex. A, Contract ¶ 10.)

19.     The Producer recognizes that NYPD Property communicates to the public, world-wide, a reputation for high standards, which reputation and goodwill have been and continue to be unique to the City. Accordingly, the Producer agrees that the NYPD Property shall not be used in any manner which would be inconsistent or damaging to the City's name and reputation.

20.     The Producer acknowledges that the unauthorized use of NYPD Property will cause irreparable harm to the City for which there is no adequate remedy at law, and that the

0036

City shall be entitled to injunctive or other equitable relief restraining such unauthorized use in addition to any other remedies available at law or in equity. (Ex. A, Contract ¶ 11.)

21.     The Contract makes clear that no party may assign the Contract – in whole or in part – without the written consent of the other party. Any attempt to assign, transfer, or delegate without such consent is void. (Ex. A, Contract ¶ 13.)

22.     The Producer agrees – without limiting any other defense or indemnification obligation otherwise owed to the City, its officials, or employees – to defend, indemnify, and hold harmless the City of New York, including its officials, officers, directors, members, employees, independent contractors, permitted successors, and permitted assignees against any third party claims, liability, loss, damages, costs and expenses (including attorneys' fees) arising out of or in connection with the Producers breach of its respective warranties and reputations. (Ex. A, Contract ¶ 14.)

23.     Both parties agree that either may terminate the Contract upon written notice to the other party if the other party fails to cure any material breach of the Contract within (30) days after receipt of written notice of such breach. (Ex. A, Contract ¶ 15.)

24.     Under the Contract, the Mayor's Office may notify Producer in writing that the Contract is terminated immediately if, in the reasonable judgement of the Mayor's Office, NYPD Property is being used in a manner inconsistent with or damaging to the NYPD's name or reputation. (Ex. A, Contract ¶ 16.)

25.     The parties agree that the Contract was executed in the City and State of New York, and that regardless of the domicile of the Producer, the Contract shall be governed and construed in accordance with the Laws of the State of New York and the Laws of the United States, where applicable. (Ex. A, Contract ¶ 17.)

26.     Under the Contract, the parties agreed to meet on or before December 31, 2025 to confer and discuss progress made on the Project and assess the current state of the relationship between the parties. (Ex. A, Contract ¶ 19.)

27.     At said time, if the Mayor's Office determined in good faith that the City is no longer able to fulfill its obligations under the Contract, including Section 4 (the "City Withdrawal"), the Producer agrees to cease generating any new photographs, footage, recording, or other materials in connection with the Project and the terms of Section 20 of the Contract shall apply. (Ex. A, Contract ¶¶ 4, 19.)

28.     Under Section 20 of the Contract, upon the termination of the Contract or in the event of a City Withdrawal, any provision of the Contract, which would survive expiration, termination, or a City withdrawal, will survive, including, without limitation, the NYPD's rights and the Producers obligations under Sections 6 and 7 of the Contract. (Ex. A, Contract ¶¶ 6-7, 20.)

**Production**

29. After the Contract went into effect, the Department provided the Producer access to NYPD Property, City personnel, police officers and the situations they encounter, and other highly sensitive agency records and materials, in reliance on the understanding between the Parties that the terms of the Contract would be followed.

30. At all relevant times, the Producer's access to this material was incumbent upon strict adherence to its obligations under the Contract including, but not limited to: to exclude Non-Usable and vetoed content, to not disseminate in any way Non-Useable and vetoed content, to not disparage or tarnish NYPD Property, to not use NYPD property in any manner which would be inconsistent or damaging to the City's name and reputation, to comply with all applicable laws in

0038

connection with the Project, and to remove content from the Project that the City is legally prohibited from releasing.

**The City's Comments to Episodes 1 through 4**

31.    On or about December 8, 2025, McGraw Media shared with the City two (2) episodes appearing to be "rough cuts" to be reviewed (Episodes 1 and 2).

32.    On or about December 13, 2025, McGraw Media shared another two (2) episodes appearing to be "rough cuts" to be reviewed (Episodes 3 and 4).

33.    Upon review, it was clear that all four of the episodes, as edited by McGraw Media, were extremely problematic and would violate the parties' Contract if released in any manner.  All of these issues were promptly raised with the Producer—the City provided written feedback to Episodes 1 and 2 on December 18, 2025. The City provided written feedback to Episodes 3 and 4 on December 26, 2025.

34.    The content identified in the feedback was explicitly deemed Non-Usable Content pursuant to Paragraph 6 of the Contract.

35.    Furthermore, the City vetoed the content identified in the feedback pursuant to  Paragraph 6 of the Contract.

36.    All content identified by time-stamp, in writing, by the City to the Producer, was therefore Non-Usable, and the City exercised its contractually authorized veto to the material.

37.    Perhaps of gravest concern is that the episodes pose an imminent threat to the life and safety of active NYPD officers.  For example, the faces, voices, and names of undercover officers conducting operations in plainclothes are not obscured, and the assets include footage of the undercover officers performing arrests in connection with those investigations.

0039

These undercover officers were also filmed alongside the former Deputy Mayor for Public Safety and former Chief of Department.

38.    Releasing the names of undercover officers would be detrimental to NYPD's ability to reduce violent crime and narcotics trafficking, and to recruit talented individuals who are willing to risk their own safety and their family's safety in order to stop violence and the distribution of deadly narcotics on our city streets. The harm to the public would be enormous if the NYPD undercover program is threatened because the identities of undercovers could no longer be protected. NYPD undercover officers have prevented acts of terrorism, saved victims of human trafficking, and removed gun traffickers from our streets. Further, undercover officers operate in an environment where they are at a tactical disadvantage. They often work alone and, depending on the situation, may have no back-up in the immediate vicinity to come to their aid. They are outnumbered by those involved in the criminal activity and who are also frequently armed. As a result, undercover officers in the field are often in grave danger and are extremely vulnerable should they be discovered and, if suspected of being undercover, could more easily be lured into a dangerous situation than an officer working in uniform.

39.    There are numerous examples of footage that cannot be released to the public under local law and under the terms of the Contract. (Ex. A, Contract ¶ 6.) For example, the identities of individuals in NYPD custody were shown without any blurring or redactions applied to their faces.

40.    Additionally, the faces of civilians, who in some cases are likely witnesses and/or victims of crimes, are depicted.  I am not aware that any of these individuals consented to be filmed in any capacity in connection with the Project, and they appear without any blurring or redactions applied to their faces.

41.     Further, the episodes feature discussions of confidential and sensitive police operations.

**The City's Comments to Episodes 5 through 18**

42.     More issues arose when McGraw Media submitted the content purportedly for episodes five (5) through eighteen (18) to the City, in what can be best described as a "footage dump" on December 14, 2025.

43.     These videos were a far cry from "rough cuts."[1]   The video content for episodes five (5) through eighteen (18) appeared to be submitted by McGraw Media to the City without any edits other than the Producer segmenting raw footage into shorter clips, and do not resemble an "episode" in the slightest.[2]

44.     These were patently not rough cuts of episodes. The Producer's own actions demonstrate their awareness of this; the Producer initially provided the City with just a large footage dump. Upon the City's voiced concern, the Producer's team quickly split this footage into shorter segments. Even with these "edits", belief that a 42 minute episode featuring an uncut 30 minute interview with just one officer would require complete and total suspension of all reason.

45.     Several of these so-called "episodes" included large segments of footage lacking any audio whatsoever.

---

[1] The City never received "rough cuts" of episodes 5-18.

[2] For instance, what purported to be a 42-minute episode provided by McGraw to the City featured a 30-minute interview with a single police officer without any edits. In addition, numerous episodes contained large segments of footage lacking any audio at all.

46.     Within the footage captured by Episodes 5 through 18 was rife with scenes that constitute Non-Usable Content and otherwise should be edited pursuant to the parties' Contract.

47.     The footage contains numerous arrests, including those of juveniles. Some of these arrests may be sealed and their disclosure would be a violation of local and state law.

48.     The Producer incorporated footage capturing an NYPD officer inputting the security code to the back door entrance to a precinct station, which could pose an active threat to members of the NYPD.

49.     On October 30, 2025, during a phone call between McGraw Media, the former Mayoral Chief of Staff, and myself, the parties agreed that the City would have ten (10) business days to review and comment on the footage for Episodes.

50.     Even though the Producer never provided the City with "rough cuts" of Episodes 5 through 18, the City still submitted its comments to the raw footage for these "episodes" on December 31, 2025.

51.     The content the City identified by time-stamp in this feedback was explicitly deemed Non-Usable Content under Paragraph 6 of the Contract.

52.     The City also vetoed all of the content identified pursuant to Paragraph 6 of the Contract.

53.     It is my understanding that McGraw Media would neither accept nor incorporate any of the City's comments. This would be a violation of the Contract, and upon information and belief, McGraw intends to distribute the assets, including the material that the City flagged for removal, which is a flagrant, albeit reckless, disregard of the Contract, public safety, local state, and even federal law.

Case 1:26-cv-00598    Document 1-1    Filed 01/22/26    Page 45 of 92

**City Withdrawal**

54.     On or about December 31, 2025, the former Chief of Staff to the Mayor submitted a letter to McGraw Media addressed to Jordan McGraw.

55.     A copy of the Letter is attached hereto as **Exhibit B**.

56.     The letter clearly and unequivocally states that the City is exercising the City right to withdraw from the Contract ("City Withdrawal") pursuant to the terms of the Contract.

57.     The letter details the City's efforts to identify the Non-Usable Content and Vetoed Material, the Producer's failure to provide a complete rough cut of every episode for review, and expressly states that this failure to provide rough cuts "will constitute a breach of the Project Agreement and irreparably harm the City." (Ex. B.)

58.     The letter notifies McGraw Media that the Mayor's Office invokes Paragraph 19 of the Contract, which requires McGraw to cease any further production of footage. The letter put McGraw on notice, "Accordingly, [Producer] must cease generating any new photographs, footage, recording, or other materials in connection with Behind the Badge." (Ex. B.)

59.     Paragraph 19 of the Contract also invokes Paragraph 20, which expressly states that the City's rights and the Producer's obligations survive City Withdrawal, including City's rights and Producer's obligations relating to Non-Usable Content and Vetoed Material.[3]

60.     Upon information and belief, there has been no further communication between Defendants and the City since December 31, 2025 after the City Withdrawal was sent.

---

[3] Ex. A, Contract, ¶¶ 19-20.

61. Given the lack of communication after the comments to the episodes were submitted and because the City has withdrawn from the Contract, the City is concerned that Defendants will disseminate the Project materials in their unedited form.

62. This lack of communication is in stark contrast to the active communication that occurred between the parties and their agents throughout the production over the year.

63. Defendants' sudden unwillingness to engage in dialogue with the City has eroded the City's confidence that the Producer will uphold its contractual obligations – leaving the status of the City's edits and how the material will be disseminated – uncertain.

64. If McGraw disseminates the footage without removing the Non-Usable and Vetoed Content, the City faces substantial and immediate irreparable harm, because the identities of undercover officers would be disclosed, in addition to the identities of arrestees whose arrests should not be public, and potential crime victims and witnesses. Further, the harm to the City is deeper than merely the harm to these individuals, as there would be an erosion of public trust in the City and the NYPD, and a misconception of the City's approval of the Project as published.

65. Accordingly, providing notice to McGraw of the instant application would also prejudice the City. Based on McGraw's recent course of conduct and refusal to acknowledge the City's comments to the footage provided thus far, I believe that it is reasonably likely that if McGraw becomes aware that the City is seeking the instant relief, Defendants, or those acting on their behalf, will take steps to transfer, sell, or otherwise disseminate the footage to others before this Court has an opportunity to make a determination on this request for relief. Accordingly, the City would be unduly prejudiced by providing notice of this application.

I affirm this 21st day of January, 2026, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, except as to matters alleged on information and belief and as to those matters I believe it to be true, and I understand that this document may be filed in an action or proceeding in a court of law.

LUIS MARTINEZ

## **WORD COUNT CERTIFICATION**

Pursuant to 22 N.Y.C.R.R. § 202.8-b, I certify that the preceding document contains 3,311 words (excluding the caption and signature block), and complies with the applicable word count limit. In making this certification, I have relied on the word count of the word processing system used to prepare the document.

Dated:          New York, New York
                January 21, 2026

_____
ELISA LEE

DocuSign Envelope ID: 17E2DACD-DE6A-4C2A-BDA0-F5548E4F1C4B

Project Agreement
between
The City of New York
And
McGraw Media, Inc.

This agreement ("Agreement") entered into on April 3, 2025, confirms our understanding of the conditions under which McGraw Media, Inc. (the "**Producer**") will develop, produce and distribute a potential television and/or digital project tentatively entitled "Behind the Badge" (the "**Project**") with the cooperation of the City of New York (the "**City**") by and through its agency the New York City Mayor's Office (the "**Mayor's Office**").

1. During the period commencing as of the date hereof and continuing for three (3) years (the "**Term**"), the Producer shall have the exclusive right to develop, produce, and distribute the Project. The Term may be extended upon the mutual written agreement of the parties.

2. The Project will consist of up to 17 episodes per year and the Producer shall be responsible for all development, production and distribution of the Project and all costs and expenses related to, or arising out of, the Project. The Producer shall not seek reimbursement or compensation from the City, or its employees, agents, contractors, or assigns for any cost or expense related to, or arising out of, the Project. The Producer shall hold the City, and its successors, assigns, employees and agents, harmless from any claims, judgments, awards, debts, expenses, damages, executor's claims, demands, and attorney's fees and costs assessed against the City, its successors, assigns, employees and agents arising out of the Project. The Producer agrees that any individual working on the Producer's behalf, whether as an employee, contractor, or otherwise, in connection with the Project will sign a release, reviewed and approved by the City, releasing the City from liability and payment to the full extent of the releases by the Producer contained in this paragraph. The parties acknowledge and agree that neither the City nor any City personnel will be compensated by the Producer for any time, effort or other cooperation expended for the Project.

3. The Producer acknowledges that its primary point of contact for this Project is the Chief of Staff to the Mayor (the "**Chief of Staff**") within the Mayor's Office. To the extent the Producer wishes to contact the New York City Police Department ("**NYPD**"), or other City personnel in connection with the Project, or to otherwise photograph, film, or record at a location within the control of the City, the Producer must first receive authorization from the Chief of Staff. The parties will work in good faith to ensure that there is no unnecessary delay in communications between the parties.

4. During the Term, and as may be reasonably requested by the Producer, the City agrees to provide the Producer with (i) access to City personnel, including but not limited to police officer(s), and the situations they encounter; and (ii) as practicable, the right to photograph, film and record the NYPD and agreed upon locations within the NYPD's control, for the sole purposes of the Project in accordance with the terms herein. The Producer agrees that it will not interfere with any City personnel's regular work obligations, and that it will at all times obey the commands and

DocuSign Envelope ID: 17EC54A1-D1FF-4C11-8E15-188BAF6FE3EB

Case 1:26-cv-00598    Document 1-1    Filed 01/22/26    Page 50 of 92

directions of any City personnel for health, safety, security or operational reasons. The Producer shall work collaboratively with the Chief of Staff who will accordingly coordinate with the NYPD to determine which NYPD personnel and locations the Producer wishes to photograph, film or record. The Producer acknowledges that there may be certain NYPD personnel and NYPD locations that the Mayor's Office, at its sole discretion, or in collaboration with the NYPD, will not make available for use in the Project.

5. The Producer will be responsible for securing all consents, releases and permits necessary to effect the development, production and distribution of the Project, except for any consents or releases from NYPD personnel. The Producer agrees not to secure consents or releases from NYPD personnel. Rather, the NYPD, through representatives at the Mayor's Office, will secure any necessary consents and releases from its personnel. The Producer acknowledges that some NYPD personnel may refuse to be filmed and that the City has no obligation to compel such personnel to participate in the Project. The Producer shall make any consent or release forms available to the City for review and approval prior to use.

6. The Producer grants the Mayor's Office the right to review and comment on completed rough cuts of episodes of the Project for purposes of identifying any portions that are inaccurate, confidential, or that the City is legally prohibited from releasing; that reveal investigatory techniques; or that would otherwise compromise public safety or the public trust as exclusively determined by the City in its reasonable discretion ("**Non-Usable Content**"). The Producer agrees not to disseminate to any person or in any format, now known or hereinafter developed, any Non-Usable Content as identified in writing to the Producer by the Mayor's Office. In consideration of the time-sensitive nature of the Producer's delivery requirements, the Mayor's Office may provide notes regarding substantive segments of an episode and reserves the right to veto any portion of the content that portrays the City or the NYPD in a negative light as exclusively determined by the Mayor's Office in its reasonable discretion within ten (10) days from receipt of an episode. The Mayor's Office shall have a right of meaningful consultation over creative decisions in connection with the Project, provided that the Producer shall have final creative control over all other elements of the Project. The Producer shall have complete control over all financial and business decisions relating to the Project.

7. The Producer agrees to provide the Mayor's Office with copies of each episode of the Project and any and all video and audio content related to the Project, including, without limitation, all deleted scenes, b-roll, and unused footage, in a time frame that will allow the NYPD to meet any and all discovery obligations.

8. The Producer shall exclusively own all now known or hereafter existing right, title and interest of every kind throughout the universe, in perpetuity and in all languages, in and to the Project and all elements therein, for all uses, forms and media now known or hereafter devised. Except for rights provided to the City in this agreement, the City waives any and all rights that the City or its personnel may have or claim to have in the Project. To the extent any rights related to the Project are not automatically owned by the Producer upon creation, to the extent the City has any rights in the Project, it hereby irrevocably assigns, transfers and conveys to the Producer, for no

INDEX NO. 450505/2026
RECEIVED NYSCEF: 01/21/2026

DocuSign Envelope ID: 17E92A7A-D3E8-4DF7-8151-9EB8FC5F3C7B

additional consideration, any such rights, and hereby waives all moral and other rights in and to the Project and any element thereof. The Producer agrees that any material created for the Project in any format, now known or hereinafter developed, shall be used exclusively for the Project and for no other purpose whatsoever.

9.  The City hereby grants to the Producer a worldwide, royalty-free and nonexclusive right and license to use, distribute, promote, and exhibit the NYPD name and approved trademarks and logos (the "**NYPD Property**"), in perpetuity, solely in connection with the Project, and each episode and element thereof, and in advertising, promotion and publicity in connection with the Project and, in connection therewith, the exhibitors and sponsors thereof. The Producer shall submit any promotional materials to the Mayor's Office for approval prior to release. The Producer agrees not to disseminate to any person or in any format, now known or hereinafter developed, any Non-Usable Content identified in writing to the Producer by the Mayor's Office, as part of or in connection with any promotional materials. In consideration of the time-sensitive nature of the Producer's delivery requirements, the Mayor's Office may provide notes regarding substantive segments of any promotional materials and reserves the right to veto any portion of the content that portrays the City or the NYPD in a negative light as exclusively determined by the Mayor's Office in its reasonable discretion within ten (10) days from receipt of same. The Mayor's Office shall have a right of meaningful consultation over creative decisions in connection with the promotional materials, provided that the Producer shall have final creative control over these promotional materials.

10. The parties agree that the NYPD Property is and shall remain exclusively the property of the City of New York acting by and through the NYPD. Producer further agrees: (i) not to make any disparaging use of NYPD Property, or use the NYPD Property outside the purposes of this agreement (except as permitted by a separate agreement), or to in any way tarnish or blur the distinctive nature of the NYPD Property, and (ii) not to register or attempt to register any NYPD Property (or any potentially similar name or trademark) as or part of a trademark, service mark, logo, slogan or Internet domain name. The NYPD Property may be used only in the exact form, style and type as approved in writing by the NYPD, and in accordance with its brand identity guidelines made available to the Producer in writing, provided that any such approval shall not be unreasonably withheld, conditioned or delayed. All use of the NYPD Property by Producer is subject to prior review and written approval of the City as set forth in this agreement, provided that any such approval shall not be unreasonably withheld, conditioned or delayed. Producer further agrees to include legal and proper ownership and/or registration notices in connection with any and all uses of NYPD Property in accordance with the reasonable requests of the NYPD.

11. Producer recognizes that NYPD Property communicates to the public, world-wide, a reputation for high standards, which reputation and goodwill have been and continue to be unique to the City. Therefore, the NYPD Property shall not be used in connection with any illegal or immoral purpose or activity, or in any manner which would be inconsistent or damaging to the City's name and reputation. Producer acknowledges that the unauthorized use of NYPD Property will cause irreparable harm to the City for which there is no adequate remedy at law, and that the City shall

DocuSign Envelope ID: 17EFCAB5-DFB7-45AB-8A2F-E2D6478C47F7

be entitled to injunctive or other equitable relief restraining such unauthorized use in addition to any other remedies available at law or in equity.

12. The Producer agrees to use good faith efforts to respond to any requests for footage from the Mayor's Office. If the Producer is compelled to disclose any footage from the Project by judicial or administrative process or other legal requirement, the Producer agrees to promptly notify the Mayor's Office (to the extent legally permitted) and reasonably cooperate with the Mayor's Office to the full extent of the law.

13. This agreement shall inure not only to the Producer's benefit but also to the benefit of all parties who may hereafter acquire the right to distribute, exhibit, advertise and/or exploit the Project or any portion thereof. No party may assign this agreement in whole or in part or any rights granted herein without written consent of the other party, except as provided for elsewhere in this agreement. Any attempt to assign, transfer, or delegate without such consent shall be void.

14. Producer represents and warrants that: (a) Producer has the full right and authority to enter into this agreement, to grant the rights herein granted and to perform Producer's obligations hereunder; (b) Producer has not made or assumed and shall not hereafter make or assume any commitment, agreement, grant or obligation that shall materially conflict with Producer's obligations hereunder; (c) Producer shall comply with all applicable laws in connection with the Project, NYPD's Property, and Producer's activities under this agreement; and (d) Producer shall use the NYPD Property in accordance with the provisions of this agreement. Without limiting any other defense or indemnification obligation otherwise owed to the City, its officials or employees, Producer shall defend, indemnify and hold harmless the City of New York, including its officials, officers, directors, members, employees, independent contractors, permitted successors, and permitted assignees against any third party claims, liability, loss, damages, costs and expenses (including reasonable outside attorneys' fees and costs) arising out of or in connection with the Producer's breach of its respective representations and warranties in this paragraph.

15. Either party may terminate this agreement upon written notice to the other party if the other party fails to cure any material breach of this agreement within (30) days after receipt of written notice of such breach. Neither party shall have any financial obligations to the other party upon termination. In the event of termination under this paragraph, the Producer will cease generating any additional photographs, footage, recording, or other materials in connection with the Project, and the terms in Section 20 shall apply.

16. In the event that NYPD Property is being used by Producer in any way which, in the reasonable judgment of the Mayor's Office, is inconsistent with or damaging to the NYPD's name or reputation, the Mayor's Office may notify Producer in writing that this agreement will be terminated immediately unless Producer ceases and halts all such uses immediately. In the event of termination under this paragraph, the Producer will cease generating any additional photographs, footage, recording, or other materials in connection with the Project and the terms in Section 20 shall apply.

FILED: NEW YORK COUNTY CLERK 01/21/2026 03:35 PM

17. This agreement shall be deemed to be executed in the City and State of New York, regardless of the domicile of the Producer, and shall be governed by and construed in accordance with the Laws of the State of New York (notwithstanding New York choice of law or conflict of law principles) and the Laws of the United States, where applicable. The parties agree that any and all claims asserted by or against the NYPD arising under or related to this agreement shall solely be heard and determined either in the courts of the United States located in the City and County of New York or in the courts of the State located in the City and County of New York.

18. The Producer and the Mayor's Office shall mutually agree upon a press release announcing the Project and any press or media plans related to the Project, as set forth herein. The Producer and the Mayor's Office shall have mutual approval over the content of such press release and any press or media plans related to the Project.

19. On or before December 31, 2025, the parties shall meet and confer to discuss progress made on the Project and assess the current state of the relationship between the parties. At such time, if the Mayor's Office determines in good faith that the City is no longer able to fulfill its obligations under this agreement, including Section 4 (the "**City Withdrawal**"), the Producer agrees to cease generating any new photographs, footage, recording, or other materials in connection with the Project and the terms in Section 20 shall apply.

20. Upon the expiration or termination of this agreement, or in the event of a City Withdrawal, any provision of this agreement, which, by its nature would survive expiration, termination or a City Withdrawal, will survive, including, without limitation, the NYPD's rights and the Producer's obligations under Sections 6 and 7 of this agreement.  For the avoidance of doubt, in no event will the expiration or termination of this agreement, or any City Withdrawal, prevent the Producer from continuing to develop, produce, and distribute any existing photographs, footage, recording, or other materials generated in cooperation with the City in connection with the Project prior to the date of such expiration, termination or City Withdrawal, in accordance with the terms herein.

Accepted and Agreed:

MCGRAW MEDIA, INC.                          THE CITY OF NEW YORK

_____                     _____
Jordan McGraw, President                    Camille Joseph Varlack
McGraw Media, Inc.                          Chief of Staff to the Mayor



THE CITY OF NEW YORK
OFFICE OF THE MAYOR
NEW YORK, NY 10007

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**

December 31, 2025

Jordan,

As you are aware, the Mayor's Office provided you with written feedback on rough cuts of Episodes 1 & 2 of Behind the Badge on December 18, 2025, and rough cuts of Episodes 3 & 4 of Behind the Badge on December 26, 2025. Earlier today, the Mayor's Office provided you with written feedback on what you have represented to be rough cuts of episodes 5-18, all of which were simultaneously provided to the City. In many instances these are plainly not rough cuts of episodes at all, but rather large blocks of raw footage and unedited segments. Pursuant to Paragraph 6 of the April 3, 2025 Project Agreement between The City of New York & McGraw Media Inc. (the "Project Agreement"), the Mayor's Office has a right to review a completed rough cut of each episode. Failure to provide the Mayor's Office with a completed rough cut of each episode for review will constitute a breach of the Project Agreement and irreparably harm the City.

To be clear, each of the video clips that we have flagged in our feedback on [12/18/2025, 12/26/2025, and 12/31/2025] constitutes Non-Usable Content as determined by the City in its reasonable discretion under Paragraph 6 of the Project Agreement and accordingly cannot be disseminated by you to any person in any format. The Mayor's Office is also exercising its right to veto the content in each of those clips pursuant to Paragraph 6 of the Project Agreement because it portrays the City and the NYPD in a negative light as exclusively determined by the Mayor's Office in its reasonable discretion. Airing any of these clips would violate the Project Agreement and irreparably harm the City.

Pursuant to Paragraph 19 of the Project Agreement, the Mayor's Office has determined in good faith that the City is no longer able to fulfill its obligations under the Project Agreement. Accordingly, you must cease generating any new photographs, footage, recording, or other materials in connection with Behind the Badge.

The City reserves all its rights.

Camille Joseph Varlack
Deputy Mayor for Administration, Chief of Staff, and Special Counsel
Office of the Mayor, City of New York

0052

SUPREME COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------- x

THE CITY OF NEW YORK,

                                    Plaintiff,

                 -against-

MCGRAW MEDIA, INC., JORDAN MCGRAW,
BEHIND THE BADGE LLC, and JOHN AND JANE
DOES 1-20,

                                  Defendants.

-------------------------------------------------------------------- x

**AFFIRMATION OF EMERGENCY IN SUPPORT OF PLAINTIFF'S APPLICATION FOR AN EX PARTE TEMPORARY RESTRAINING ORDER**

Index No: _____/2026

City File No: 2026-000814

       **ELISA LEE**, an attorney admitted to practice law in the State of New York and an Assistant Corporation Counsel of the City of New York affirms the truth of the following under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, except as to matters alleged on information and belief and as to those matters I believe it to be true, and I understand that this document may be filed in an action or proceeding in a court of law.

       1.      This affirmation is submitted in support of the motion of Plaintiff the City of New York (hereinafter referred to as "the City"), in support of the within motion requesting that this Court (i) issue an order preliminarily enjoining Defendants McGraw Media, Inc. ("McGraw Media"), Jordan McGraw ("Mr. McGraw"), and Behind the Badge LLC from transferring, selling, disposing of, or in any way disseminating and/or distributing any project material pertaining to the digital project entitled "Behind the Badge" (the "Project") involving numerous members of service of the New York City Police Department ("NYPD" or "Department") without first removing the Non-Usable Content and Vetoed Material as identified by the City; (ii) during the pendency of this

motion, temporarily staying and restraining Defendants, and those acting on their behalf, from acting in any way to transfer and/or sell and/or distribute and/or disseminate project material related to or in connection with the Project without first removing the Non-Usable Content and Vetoed Material as identified by the City; (iii) pursuant to 22 NYCRR § 216.1, ordering that future filings by any party in the above-captioned action to the extent they contain, describe or otherwise reference Non-Usable Content or Vetoed Material as described in the Contract be redacted and/or filed under seal; and (iv) for such other and further relief as this Honorable Court may deem proper.

2.      No prior application has been made by the City for the relief sought herein in this or any other proceeding.

3.      Pursuant to Uniform Civil Rule 202.7(f), the City is seeking this relief *ex parte* and is unable to provide Defendants with advance notice of the City's instant request for a temporary restraining order due to significant prejudice to the City and its citizens that could result by the giving of notice. Specifically, based on the actions of Defendants as discussed in the accompanying affirmation of Luis Martinez ("Martinez Affirmation" or "Aff.") and summarized herein, the City has a reasonable belief that advanced notice of this application could result in Defendants, and those acting on their behalf, distributing video material in furtherance of purely commercial interests that significantly threatens members of the NYPD and the public by revealing the identities of undercover officers, juvenile arrestees, and crime victims, among other harms.

4.      As explained in the Martinez Affirmation and the accompanying motion papers and Complaint, the Project granted Defendants special, behind-the-scenes, exclusive access to film NYPD operations so that Defendants could gather appropriate footage for an episodic video and/or digital project. Given the sensitive nature of the Department's work, the parties contracted and agreed that the City would have the opportunity to review rough cuts of the episodes filmed

by Defendants and that certain material, in the reasonable discretion of the City, would not be aired or otherwise disseminated. Martinez Aff. Exhibit A (Contract).

5.    In reliance on this agreement, the City provided access to Defendants to NYPD Property, City personnel, police officers, and the situations they encounter in real-time, all with the understanding that Defendants' access was strictly conditioned upon its obligation to exclude Non-Usable and Vetoed Material, to not use its access in a way that would be damaging to the City's name and reputation, to comply with all applicable laws in connection with the Project, and to remove content from the Project that the City is legally prohibited from releasing upon request. Martinez Aff. Exhibit A.

6.    On or about December 8 and December 13, 2025, Defendant McGraw Media shared with the City the first four episodes appearing to be "rough cuts" to be reviewed. Martinez Aff. ¶¶ 31-32.

7.    Upon review, it was clear that all four of the episodes, as edited by McGraw Media, were extremely problematic and would violate the parties' Contract if released in any manner.   Martinez Aff. ¶ 33.

8.    Perhaps of gravest concern is that the episodes pose an imminent threat to the life and safety of active NYPD officers.  For example, the faces, voices, and names of undercover officers conducting operations in plainclothes are not obscured, and the assets include footage of the undercover officers performing arrests in connection with those investigations. Martinez Aff. ¶ 37.

9.    Undercover officers have faced threats when their identities were revealed. Police officers working undercover investigate the most serious and violent criminal activities that include organized crime, narcotics and weapons trafficking, terrorist plots, gang violence, and

murder. Undercover officers interact closely with persons engaged in dangerous criminal activities. Undercover officers typically wear no protective gear or equipment, and are isolated from fellow officers during their work. Martinez Aff. ¶ 38.

10.    All of the Non-Usable Content and Vetoed Material in the episodes was promptly identified by the City to McGraw Media—the City provided written feedback designating content as Non-Usable Content and Vetoed Material on December 18 and December 26, 2025. Martinez Aff. ¶¶ 33-36.

11.    More issues arose when McGraw Media submitted the content purportedly for episodes five (5) through eighteen (18) to the City, in what can be best described as a "footage dump" on December 14, 2025. These videos were not "rough cuts" – they appeared to be wholly unedited other than raw footage being cut into shorter clips. Martinez Aff. ¶¶ 42-43.

12.    Indeed, the City has never received rough cuts for Episodes 5 through 18, and is currently in the dark about what McGraw Media is intending to do with any of the video footage. Martinez Aff. ¶ 50.

13.    Even though the City never received rough cuts of episodes 5-18, it nevertheless submitted its comments to the raw footage for these so-called "episodes" on December 31, 2025. Martinez Aff. ¶¶ 44-52.

14.    In addition to capturing NYPD tactics, the identification of undercover officers, and other confidential material, McGraw Media also incorporated footage in these "episodes" capturing an NYPD officer inputting the security code to the back door entrance to a precinct station, which could pose an active threat to members of the NYPD. Martinez Aff. ¶ 48.

INDEX NO. 450505/2026
RECEIVED NYSCEF: 01/21/2026

15.     Moreover, this raw footage also contains numerous arrests, including those of juveniles. Some of these arrests may be sealed and their disclosure would be a violation of local and state law. Martinez Aff. ¶ 47.

16.     As explained further in the accompanying Martinez Aff., these are just some of the examples of Non-Usable Content and Vetoed Material on the footage.  Martinez Aff. ¶¶ 37-41, 46-48.

17.     Any sale, transfer, or dissemination of this video content without meaningful consultation with the City and full incorporation of the City's edits, redactions, and removals would endanger the lives and safety of victims, officers, witnesses, and other civilians captured on the footage.  The sale, transfer, or dissemination of the content would compromise public safety, tarnish public trust in the NYPD and the City, and harm the ability of the NYPD to respond meaningfully to ongoing and future investigations.

18.     On December 31, 2025, the City formally withdrew from its contract with McGraw Media. Martinez Aff. Exhibit B (Withdrawal Letter).

19.     Defendants never responded to the City's identification of Non-Usable Content and Vetoed Material for the raw footage for episodes 5-18. Nor has it provided rough cuts of these episodes as contemplated under the Contract. In fact, Defendants did not even respond to the withdrawal notice issued by the City. Martinez Aff. ¶¶ 42-60.

20.     Because McGraw Media has not responded to the City's communications and there has been no contact between the parties since December 31, 2025, there is significant uncertainty as to the status of the video assets that are in Defendants' possession, and what Defendants intend to do with the footage. Martinez Aff. ¶¶ 60-61.

21.     Defendants have previously expressed an intention for the episodes to air in 2026 and have expressed a willingness to publish the episodes themselves or otherwise sell the video footage to a third party. Complaint ¶ 37.

22.     There is therefore the very real possibility that, absent a restraining order, the videos at issue will be disseminated, and confidential NYPD procedures and the unredacted identities of undercover officers captured on film will become public. Martinez Aff. ¶ 64.

23.     Moreover, if notice is provided to Defendants concerning the relief that the City seeks here—namely equitable and injunctive relief to prevent the unedited video footage of numerous on-duty members of service of the NYPD without redactions or removal of content flagged by the City from being disseminated—it is reasonably foreseeable that any sale would be finalized and the footage at-issue would be disseminated to a third party without the edits required by the City.  The relief sought herein under contract would be significantly more difficult to enforce against a third party, and may be impossible once the footage is distributed.

24.     Due to the uncertainties surrounding the Defendants' intentions with respect to the at-issue assets based on Defendants' silence to the City's proposed edits, coupled with the high probability that irreparable harm would result as soon as the assets are disseminated in any form, notice of an application for a TRO should not be required here.

**WHEREFORE**, it is respectfully requested that the Court (i) issue an order preliminary enjoining Defendants, and those acting on their behalf, from transferring, selling, disposing of, or in any way disseminating and/or distributing any project material pertaining to the Project without first removing the Non-Usable Content and Vetoed Material as identified by the City; (ii) during the pendency of this motion, temporarily staying and restraining Defendants, and those acting on their behalf, from acting in any way to transfer and/or sell and/or distribute and/or

disseminate project material related to or in connection with the Project without first removing the

Non-Usable Content and Vetoed Material as identified by the City; (iii) pursuant to 22 NYCRR §

216.1, ordering that future filings by any party in the above-captioned action to the extent they

contain, describe or otherwise reference Non-Usable Content or Vetoed Material as described in

the Contract be redacted and/or filed under seal; and (iv) for such other and further relief as this

Honorable Court may deem proper.

Dated:      New York, New York
            January 21, 2026


                                    _elisa lee_____
                                    ELISA LEE

WORD COUNT CERTIFICATION

Pursuant to 22 N.Y.C.R.R. § 202.8-b, I certify that the preceding document contains 1,762 words (excluding the caption and signature block), and complies with the applicable word count limit. In making this certification, I have relied on the word count of the word processing system used to prepare the document.

Dated:        New York, New York
              January 21, 2026

_____
ELISA LEE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------------- x

THE CITY OF NEW YORK,

<div style="margin-left:40%">Plaintiff,</div>

-against-

MCGRAW MEDIA, INC., JORDAN MCGRAW,
BEHIND THE BADGE LLC, and JOHN AND JANE
DOES 1-20,

<div style="margin-left:40%">Defendants.</div>

Index No.

City File No: 2026-000814

---------------------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

MURIEL GOODE-TRUFANT
Corporation Counsel of the City of New York
Attorney for the City of New York
100 Church Street, 3rd Floor
New York, New York 10007
(212) 356-2328/2612

*Of Counsel*:
ELISA LEE
MAXWELL CANTY-HILCHEY (not yet admitted)

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 2

     A.  CONTRACT PROVISIONS AT-ISSUE ......................................................... 3

     B.  CITY'S COMMENTS TO THE AT-ISSUE ASSETS .................................... 5

     C.  CITY WITHDRAWAL ................................................................................. 7

ARGUMENT ........................................................................................................... 8

     A.  THE CITY IS LIKELY TO SUCCEED ON THE MERITS ........................... 9

     B.  THE CITY, THE NYPD, AND THE CIVILIANS IDENTIFIED IN THE FOOTAGE WILL SUFFER IRREPARABLE INJURY ABSENT PRELIMINARY INJUNCTIVE RELIEF ....................................................... 14

     C.  A BALANCING OF THE EQUITIES WEIGHS DECISIVELY IN FAVOR OF THE CITY ............................................................................................... 17

CONCLUSION ...................................................................................................... 18

WORD COUNT CERTIFICATION ......................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*,
   42 N.Y.2d 538 (1977) ...........................................................................................14

*Asprea v. Whitehall Interiors NYC, LLC*,
   206 A.D.3d 402 (1st Dep't 2022) .........................................................................17

*Barbes Restaurant Inc. v. ASRR Suzer 218, LLC*,
   140 A.D.3d 430 (1st Dep't 2016) ...........................................................................9

*Bd. of Managers of Colonnade Condo. v. 32F at 347 W. 57th St., LLC*,
   171 A.D.3d 682 (1st Dep't 2019) ...........................................................................8

*Matter of Bellamy v New York City Police Dept.*,
   59 A.D.3d 353 (1st Dep't 2009) ...........................................................................16

*Board of Higher Educ. of City of New York v. Marcus*,
   63 Misc. 2d 268 (Sup. Ct., Kings County 1970)...................................................14

*Coinmach Corp. v. Fordham Hill Owners Corp.*,
   3 A.D.3d 312 (1st Dep't 2004) ...............................................................................8

*Matter of Connolly v. New York Guard*,
   175 A.D.2d 372 (3d Dep't 1991) ..........................................................................16

*Due Peci, Inc. v. Von Vonni Inc.*,
   2012 N.Y. Misc. LEXIS 6866 (Sup. Ct., N.Y. County Mar. 23, 2012) ................17

*Gilliland v. Acquafredda Enterprises, LLC*,
   92 A.D.3d 19 (1st Dep't 2011) ...............................................................................9

*Huguenot LLC v. Megalith Capital Group Fund I, LP*,
   191 A.D.3d 530 (1st Dep't 2021) ...........................................................................8

*Ivy League School, Inc. v Danick Indus., Inc.*,
   44 Misc. 3d 1223(A) (Sup. Ct., Suffolk County 2014)..........................................14

*Marriott Int'l, Inc. v. Eden Roc, LLLP*,
   Index No. 653590/2012, 2012 N.Y. Misc. LEXIS 6246 (Sup. Ct., N.Y.
   County Nov. 7, 2012)............................................................................................14

*Poll v. Gallagher's Stud, Inc.*,
   Index No. 156708/2022, 2022 N.Y. Misc. LEXIS 3833 (Sup. Ct. N.Y. County
   June 13, 2022)...................................................................................................9, 10

*Princes Point LLC v Muss Dev. L.L.C.*,
　30 N.Y.3d 127 (2017) ................................................................................10

*Republic of Lebanon v. Sotheby's*,
　167 A.D.2d 142 (1st Dep't 1990) ...............................................................9

*Matter of Rodriguez v. Johnson*,
　66 A.D.3d 536 (1st Dep't 2009) ................................................................16

*Vector Media, LLC v. Go New York Tours Inc.*,
　187 A.D.3d 531 (1st Dep't 2020) .........................................................12, 15

*Wilder v. Fresenius Med. Care Holdings, Inc.*,
　175 A.D.3d 406 (1st Dep't 2019) ...............................................................9

**Statutes & Other Authorities**

Civil Rights Law § 50-a(1) ...........................................................................11

Criminal Procedure Law § 160.50 ...............................................................12

Health Insurance Portability and Accountability Act ..................................12

N.Y. Gen. Bus. Law § 360-l ........................................................................13

Public Officers Law § 87(2)(a) ....................................................................12

Public Officers Law § 87(2)(b) ....................................................................11

Public Officers Law § 87(2)(e) ....................................................................12

Public Officers Law § 87(2)(f) ...............................................................12, 16

CPLR 6301.....................................................................................................9

## PRELIMINARY STATEMENT

This is an action seeking injunctive relief concerning Defendants' likely imminent sale and/or transfer and/or dissemination of video footage taken of numerous members of service of the New York City Police Department (hereinafter referred to as "NYPD" or the "Department") without redactions or removal of content flagged by the City, in violation of the parties' express agreement.

Defendants must be enjoined from taking actions that would threaten the safety of NYPD officers, their families, and other members of the public by publishing, releasing, or selling, footage of highly sensitive NYPD activities and operations that Defendants only had access to by virtue of their agreement with the City of New York (hereinafter referred to as the "City"). Defendants have disavowed their obligations under the Contract to allow the City to veto the use of any portion of the footage, and in the absence of an injunction, are likely to release such shockingly damaging information—such as the faces and identities of undercover officers, the faces of crime victims and witnesses, and detailed confidential operational information such as encrypted police communications—that would undoubtedly present a threat of imminent harm to the life and safety of numerous members of the NYPD and civilians captured on footage and endanger law enforcement operations. Moreover, NYPD's reputation and goodwill would be irreversibly damaged if viewers see the footage in the form Defendants intend to release it in, because of the likely misperception that the NYPD permitted the disclosure of such sensitive information.  The irreparable harm that would befall the City and the Department would not be cabined to the subject matter captured in video footage – the footage, if released, would seriously impair the ability of the NYPD to perform ongoing investigations, would harm the ability of the NYPD to conduct future investigations, could create a chilling effect on the willingness of

0065

witnesses to crimes and victims to cooperate with the NYPD, would compromise public safety, and would tarnish the public trust in the NYPD and the City.

As the City will unquestionably be irreparably harmed in the absence of an injunction in ways not compensable by money damages, and Defendants' sole interest in the video footage is commercial, a temporary restraining order and preliminary injunction restraining Defendants from disseminating, publishing, releasing, distributing, transferring and/or selling the footage, are necessary to protect the City and innocent individuals from these devastating consequences.

## STATEMENT OF FACTS

This action arises out of a Project Agreement (hereinafter referred to as the "Contract") between the City, acting through the former Mayor's Chief of Staff, and Defendants McGraw Media acting by and through its President, Defendant Jordan McGraw[1] to develop, produce and distribute a potential television and/or digital multi-episode project regarding the NYPD tentatively entitled "Behind the Badge" (hereinafter referred to as the "Project").[2] The Project granted Defendants special, behind-the-scenes, exclusive access to film NYPD operations.[3] Given the sensitive nature of the Department's work, the express contractual understanding between the parties was that the City, through the Mayor's Office, would have the opportunity to review rough cuts of episodes and that certain material, in the reasonable discretion

---

[1] Upon information and belief, Defendant Jordan McGraw is a managing member of a limited liability company entitled Behind the Badge LLC, which bears the same name as the Project.

[2] *See* Affirmation of Luis Martinez in Support of Plaintiff's Request for Temporary Restraining Order and Preliminary Injunction ("Martinez Aff.") submitted herewith; Martinez Aff. Ex. A, Contract.

[3] Martinez Aff. ¶ 8.

of the City, would not be aired or otherwise disseminated.[4] Now, Defendants have disavowed their

obligations to allow the City control over what material becomes part of the Project, risking

immediate and irreparable harm to the City, its employees, and the public at large.[5]

A.    Contract Provisions At-Issue

The Contract provides the parties' obligations with respect to content of the Project

episodes, including the City's express rights to review and comment on "rough cuts" of episodes,

including *inter alia* portions that the City is legally prohibited from releasing or otherwise would

compromise public safety or the public trust ("Non-Usable Content"), and McGraw Media's

express agreement to not disseminate those portions exclusively determined by the City to be Non-

Usable Content.[6]  In relevant part, paragraph 6 of the Contract states the following about the

parties' rights and obligations concerning Non-Usable Content:

> The Producer grants the Mayor's Office the right to review and
> comment on completed rough cuts of episodes of the Project for
> purposes of identifying any portions that are inaccurate,
> confidential, or that the City is legally prohibited from releasing;
> that reveal investigatory techniques; or that would otherwise
> compromise public safety or the public trust as exclusively
> determined by the City in its reasonable discretion ("**Non-Usable
> Content**"). The Producer agrees not to disseminate to any person or
> in any format, now known or hereinafter developed, any Non-
> Usable Content as identified in writing to the Producer by the
> Mayor's Office.[7]

Additionally, the Contract provides that the City can, exclusively, in its reasonable

discretion, veto any content from being disseminated where it portrays the City or the NYPD in a

---

[4] *Id.*

[5] *Id.* ¶¶ 61-65; Complaint ¶ 66.

[6] Martinez Aff. Ex. A, Contract ¶¶ 4, 6.

[7] Martinez Aff. Ex. A, Contract ¶ 6.

negative light ("Vetoed Material").[8]   In relevant part, paragraph 6 of the Contract states the

following about the parties' rights and obligations concerning Vetoed Material:

> In consideration of the time-sensitive nature of the Producer's
> delivery requirements, the Mayor's Office may provide notes
> regarding substantive segments of an episode and reserves the right
> to veto any portion of the content that portrays the City or the NYPD
> in a negative light as exclusively determined by the Mayor's Office
> in its reasonable discretion within ten (10) days from receipt of an
> episode.[9]

With respect to the dissemination of Non-Usable Content and Vetoed Materials,

paragraph 9 of the Contract reiterates these rights and obligations as follows:

> The Producer shall submit any promotional materials to the Mayor's
> Office for approval prior to release. The Producer agrees not to
> disseminate to any person or in any format, now known or
> hereinafter developed, any Non-Usable Content identified in writing
> to the Producer by the Mayor's Office, as part of or in connection
> with any promotional materials. In consideration of the time-
> sensitive nature of the Producer's delivery requirements, the
> Mayor's Office may provide notes regarding substantive segments
> of any promotional materials and reserves the right to veto any
> portion of the content that portrays the City or the NYPD in a
> negative light as exclusively determined by the Mayor's Office in
> its reasonable discretion within ten (10) days from receipt of same.
> The Mayor's Office shall have a right of meaningful consultation
> over creative decisions in connection with the promotional
> materials, provided that the Producer shall have final creative
> control over these promotional materials.[10]

In recognition of the particularized need to protect the NYPD's unique reputation

for high standards and good will and the fact that snippets of footage could be misconstrued or

taken out of context, McGraw Media further agreed under the Contract that "NYPD Property shall

---

[8] *Id.*

[9] *Id.*

[10] *Id.* ¶ 9.

not be used in connection with any illegal or immoral purpose or activity, or in any manner which would be inconsistent or damaging to the City's name and reputation. Producer acknowledges that the unauthorized use of NYPD Property will cause irreparable harm to the City for which there is no adequate remedy at law, and that the City shall be entitled to injunctive or other equitable relief restraining such unauthorized use in addition to any other remedies available at law or in equity."[11]

    B.    <u>City's Comments to the At-Issue Assets</u>

On or about December 8, 2025, McGraw Media shared with the City two episodes represented as "rough cuts" to be reviewed (Episodes 1 and 2).[12] On or about December 13, 2025, McGraw Media shared another two episodes represented as "rough cuts" to be reviewed (Episodes 3 and 4).[13] Upon review, it was clear that all four of the episodes, as edited by McGraw Media, would violate the parties' Contract if released in *any manner*.[14] All of these issues were promptly raised with the Producer—the City provided written feedback to Episodes 1 and 2 on December 18, 2025, and on December 26, 2025, the City provided written feedback to Episodes 3 and 4.[15]

Perhaps of gravest concern is that the episodes pose an imminent threat to the life and safety of active NYPD officers. For example, the faces, voices, and names of undercover officers conducting operations in plainclothes are not obscured.[16] There are numerous other pieces of harmful footage that cannot be released to the public. For example, the identities of individuals

---

[11] *Id.* ¶ 11.

[12] Martinez Aff. ¶ 31; Complaint ¶ 15.

[13] Martinez Aff. ¶ 32; Complaint ¶ 15.

[14] Martinez Aff. ¶ 33; Complaint ¶ 16.

[15] Martinez Aff. ¶ 33; Complaint ¶ 22.

[16] Martinez Aff. ¶ 37; Complaint ¶ 17.

in NYPD custody are depicted in the rough cuts without any blurring or redactions applied to their faces.[17]  Additionally, the faces of civilians, who in some cases are likely witnesses and/or victims of crimes, are depicted.  None of these individuals consented to be filmed in any capacity in connection with the Project and they appear without any blurring or redactions applied to their faces.[18]  Further, the episodes feature discussions of confidential and sensitive police operations.[19]

More issues arose when McGraw Media submitted the content purportedly for "episodes" 5 through 18 to the City, in what can be best described as an unedited footage dump on December 14, 2025.[20]  These videos were a far cry from "rough cuts."[21]  The video content for "episodes" 5 through 18 appeared to be submitted by McGraw Media to the City without any edits other than the Producer segmenting raw footage into shorter clips, and each clip does not resemble an "episode" in the slightest.[22]

Within the footage captured by "episodes" 5 through 18, the content delivered to the City was rife with scenes that constitute Non-Usable Content and otherwise should not be usable pursuant to the Contract.  For example, the Producer incorporated footage capturing an

---

[17] Martinez Aff. ¶ 39; Complaint ¶ 18.

[18] Martinez Aff. ¶ 40; Complaint ¶ 19.

[19] Martinez Aff. ¶ 41; Complaint ¶ 20.

[20] Martinez Aff. ¶ 42; Complaint ¶ 23.

[21] The City never received "rough cuts" of episodes 5-18.  Martinez Aff. ¶¶ 42-44; Complaint ¶ 24.

[22] For instance, what purported to be a 42-minute "episode" provided by McGraw Media to the City featured a 30-minute interview with a single police officer without any edits. In addition, numerous "episodes" contained large segments of footage lacking any audio at all. Martinez Aff. ¶ 44; Complaint ¶ 25.

NYPD officer inputting the security code to the back door entrance to a precinct station, which could pose an active threat to members of the NYPD.[23]

While the City was never provided with rough cuts of Episodes 5 through 18, the City still submitted its comments to the raw footage for these "episodes" on December 31, 2025.[24] However, in direct violation of the Contract, McGraw Media represented that they would not accept any of the City's edits, apparently would not provide "rough cuts" as required by contract, and that it intended to distribute the material that the City flagged for removal.[25]  Alarmingly, the Producer indicated to the City that it is looking for a buyer of the footage to air the episodes in 2026, and even if it does not find a buyer, it could self-publish the footage at any time.[26]

C.    City Withdrawal

On or about December 31, 2025, the former Chief of Staff to the Mayor submitted a letter to McGraw Media addressed to Jordan McGraw, exercising the City right to withdraw from the Contract ("City Withdrawal") pursuant to the terms of the Contract.[27]

In summary, the letter details the City's efforts to flag the Non-Usable Content and Vetoed Material, and the Producer's failure to provide a complete rough cut of every episode for

---

[23] Martinez Aff. ¶ 48; Complaint ¶ 29.

[24] Martinez Aff. ¶¶ 50-52; The parties verbally agreed to a ten (10) business days' time period. *Id.* ¶ 49.

[25]*Id.* ¶ 53; Complaint ¶¶ 36.

[26] Complaint ¶ 37.

[27] A copy of the letter memorializing the City Withdrawal is attached as **Exhibit B** to the Martinez Affirmation.

review.  The letter expressly states that this failure to provide rough cuts "will constitute a breach of the Project Agreement and irreparably harm the City."[28]

Further, the letter notifies McGraw Media that the Mayor's Office invokes Paragraph 19 of the Contract, which pertains to City Withdrawal, and explains that "the Mayor's Office has determined in good faith that the City is no longer able to fulfill its obligations under the Project Agreement. Accordingly, you must cease generating any new photographs, footage, recording, or other materials in connection with Behind the Badge."[29]  Paragraph 19 of the Contract also invokes Paragraph 20, which expressly states that the City's rights and the Producer's obligations survive City Withdrawal, including City's rights and Producer's obligations relating to Non-Usable Content and Vetoed Material.[30]

## **ARGUMENT**

A temporary restraining order ("TRO") and preliminary injunction for the limited purpose of maintaining the status quo is necessary to protect the public interest in these unique factual circumstances. *Bd. of Managers of Colonnade Condo. v. 32F at 347 W. 57th St., LLC*, 171 A.D.3d 682, 682 (1st Dep't 2019) (the "purpose of a temporary restraining order is to preserve the status quo"); *Huguenot LLC v. Megalith Capital Group Fund I, LP*, 191 A.D.3d 530, 530 (1st Dep't 2021) (citing *Coinmach Corp. v. Fordham Hill Owners Corp.*, 3 A.D.3d 312, 314 (1st Dep't 2004)) ("A preliminary injunction is a provisional remedy designed for the narrow purpose of maintaining the status quo[.]").  This Court is authorized to grant a temporary restraining order pending a hearing for a preliminary injunction, where, as here, "it appears that immediate and

---

[28] Martinez Aff. Ex. B, City Withdrawal.

[29] *Id.*

[30] Martinez Aff. Ex. A, Contract, ¶¶ 19-20.

irreparable injury, loss or damage will result unless the defendant is restrained before the hearing can be had." CPLR 6301.

A party is entitled to temporary injunctive relief where the facts demonstrate (1) a likelihood of success on the merits, (2) the possibility of irreparable harm in the absence of a preliminary injunction, and (3) that the balance of the equities favors the movant. *See Wilder v. Fresenius Med. Care Holdings, Inc.*, 175 A.D.3d 406, 409 (1st Dep't 2019); *Gilliland v. Acquafredda Enterprises, LLC*, 92 A.D.3d 19, 24 (1st Dep't 2011). As demonstrated below, all three prongs are satisfied here.

A.   <u>The City Is Likely to Succeed on the Merits</u>

To establish a likelihood of success on the merits, "a prima facie showing of a reasonable probability of success is sufficient; actual proof of the [plaintiff's] claims should be left to a full hearing on the merits." *Barbes Restaurant Inc. v. ASRR Suzer 218, LLC*, 140 A.D.3d 430, 431 (1st Dep't 2016) (citations omitted). "A likelihood of success on the merits may be sufficiently established even where the facts are in dispute and the evidence need not be conclusive." *Id.* "Where denial of injunctive relief would render the final judgment ineffectual, the degree of proof required to establish the element of likelihood of success on the merits should accordingly be reduced." *Poll v. Gallagher's Stud, Inc.*, Index No. 156708/2022, 2022 N.Y. Misc. LEXIS 3833, at *7-8 (Sup. Ct., N.Y. County June 13, 2022) (citing *Republic of Lebanon v. Sotheby's*, 167 A.D.2d 142, 145 (1st Dep't 1990)).

The City is likely to succeed on the merits of its claims against McGraw Media based on Defendants' anticipated breach of paragraph 6 of the Contract, which governs McGraw Media's express agreement to not disseminate Non-Usable Content once identified in writing by

the City.[31]  "An anticipatory breach of contract by a promisor is a repudiation of [a] contractual duty before the time fixed in the contract for … performance has arrived[.]"  *Princes Point LLC v Muss Dev. L.L.C.*, 30 N.Y.3d 127, 133 (2017) (internal citations omitted).  An anticipatory breach of a contract—also known as an anticipatory repudiation—can be demonstrated by "a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach[.]"  *Id.*  The Court of Appeals has clarified that "a wrongful repudiation of the contract by one party before the time for performance entitles the nonrepudiating party to immediately claim damages for a total breach."  *Id.*; *Poll v. Gallagher's Stud*, 2022 N.Y. Misc. LEXIS 3833, at *2, 8 (finding plaintiff adequately demonstrated defendant's anticipatory breach by refusing to confirm the closing date when defendant responded to the email that it is "adjourning closing until the rent issues are resolved").

Here, upon receiving completed purported "rough cuts" of Episodes 1 through 4 for the Project and wholly unedited versions of "episodes" 5 through 18, the City promptly provided comments including about necessary redactions and removals of content it deems to be "Non-Usable Content."  However,  Defendants failed to respond to the City at all, let alone acknowledge that they would accept the City's edits,[32] which is in direct contravention of the Producer's obligations under the Contract—namely, the Producer "agrees not to disseminate to any person or in any format … any Non-Usable Content as identified in writing to the Producer

---

[31] Ex. A, Contract ¶ 6; Complaint ¶¶ 53-67.

[32] The City's edits include both Non-Usable Content and Vetoed Material.

by the Mayor's Office."[33]  The Contract does not provide to the Producer any ability to question or reject the City's written designation of Non-Usable Content.

"Non-Usable Content" is defined as including those portions "that are inaccurate, confidential, or that the City is legally prohibited from releasing; that reveal investigatory techniques; or that would otherwise compromise public safety or the public trust as exclusively determined by the City in its reasonable discretion[.]"[34]  This provision expressly acknowledges and incorporates the Producer's agreement to prevent the release of certain information that the City is legally prohibited from releasing to the public domain—specifically, certain categories of information that have been legislatively and judicially recognized as being of such a confidential and sensitive nature that, if disclosed:

- would constitute "an unwarranted invasion of personal privacy";[35]

- would "interfere with law enforcement investigations or judicial proceedings, deprive a person of a right to a fair trial or impartial adjudication, identify a confidential source or disclose confidential

---

[33] Ex. A, Contract ¶ 6.  The parties' rights and obligations survive the termination of the Contract. *Id.* ¶ 20.

In addition, the City has the right to veto content that portrays the City or the NYPD in a negative light within ten (10) days from receipt.  *Id.* ¶ 6. In that regard, while the parties orally agreed to a period of ten (10) business days for the City to provide comments to "episodes" 1-18 (Martinez Aff. ¶ 49), the City never received rough cuts of those episodes, so the time period to provide comments concerning Vetoed Material never started to run.

[34] Ex. A, Contract ¶ 6.

[35] Public Officers Law § 87(2)(b); *see also* Civil Rights Law § 50-a(1).

information relating to a criminal investigation, or reveal criminal investigative techniques and procedures";[36] or

- "could endanger the life or safety of any person."[37]

These were the exact types of redactions and removals requested by the City on December 18, 26, and 31, 2025, which the Producer has failed to incorporate, despite having no right to do so under the Contract.

Significantly, McGraw Media understood the type of irreparable harm that would befall the City and the NYPD upon breach as it specifically acknowledged that "unauthorized use of NYPD Property will cause irreparable harm to the City for which there is no adequate remedy at law, and that the City shall be entitled to injunctive or other equitable relief restraining such unauthorized use in addition to any other remedies available at law or in equity."[38]

The contract language here is analogous to the contract language at issue in *Vector Media, LLC v. Go New York Tours Inc.*, where the First Department affirmed a grant of preliminary injunction where "the parties explicitly agreed in the contract that if defendant breached or threatened to breach, plaintiff's damages would be irreparable and that injunctive relief would be

---

[36] Public Officers Law § 87(2)(e).

[37] Public Officers Law § 87(2)(f).

In addition, Public Officers Law § 87(2)(a) allows the City to deny the public access to records, or portions thereof that are "specifically exempted from disclosure by state or federal statue. These would include categories of information that would require specific authorization by a third party for release of any portion thereof, including, for example such information that is protected by HIPAA (Health Insurance Portability and Accountability Act) and the Criminal Procedure Law § 160.50.

[38] Ex. A, Contract ¶ 11.

appropriate," even where the parties also disputed whether there was irreparable harm, 187 A.D.3d 531, 531 (1st Dep't 2020).

The City has established prima facie that there is a reasonable probability of succeeding on the merits of its claims against Defendants based on the Defendants' anticipated breach of the Contract given Defendants' failure to accept any of the edits that were provided by the City in violation of the Contract, and the Defendants' intent to disseminate the At-Issue Assets.[39]

While the Contract granted a limited license for McGraw Media to "use, distribute, promote, and exhibit the NYPD name and approved trademarks and logos" in connection with the Project, such license was granted expressly in contemplation of McGraw Media's compliance with the Contract.[40] Specifically, McGraw Media, in apparent recognition of the *distinctive nature* of the NYPD's reputation that would be at risk of injury, agreed "not to make any disparaging use of NYPD Property, or use the NYPD Property outside the purposes of this agreement … , or to in any way tarnish or blur the distinctive nature of the NYPD Property[.]"[41]  The types of harm that the Producer agreed that would likely result from noncompliance with the limited license is identical to the types of harm protected by trademark dilution statutes entitling a plaintiff to injunctive relief.  *See* N.Y. Gen. Bus. Law § 360-l ("Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered …  notwithstanding the absence of competition

---

[39] Complaint ¶¶ 52-66; Martinez Aff. ¶ 53.

[40] Ex. A, Contract ¶¶ 9-10.

[41] The Producer recognized "that NYPD Property communicates to the public, world-wide, a reputation for high standards, which reputation and goodwill have been and continue to be unique to the City[.]"  *Id.* ¶ 11.

between the parties or the absence of confusion as to the source of goods or services."); *see Ivy League School, Inc. v Danick Indus., Inc.*, 44 Misc. 3d 1223(A), 1223A (Sup. Ct., Suffolk County 2014) ("Injunctive relief is available to a plaintiff claiming injury to business reputation and/or trademark dilution[.]") (citing *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 541-42 (1977)). The City has also established prima facie that there is a reasonable probability of the NYPD Property being "tarnish[ed]" absent an injunction.

B.     The City, the NYPD, and the Civilians Identified in the Footage Will Suffer Irreparable Injury Absent Preliminary Injunctive Relief

It is well established that "[an] injury is irreparable when it cannot be adequately compensated in damages or there is no set pecuniary standard for the measurement of damages." *Board of Higher Educ. of City of New York v. Marcus*, 63 Misc. 2d 268, 273 (Sup. Ct., Kings County 1970). Under New York law, "reputational harm and harm to good will constitute irreparable harm for which damages are an inadequate remedy." *Marriott Int'l, Inc. v. Eden Roc, LLLP*, Index No. 653590/2012, 2012 N.Y. Misc. LEXIS 6246, at *11 (Sup. Ct., N.Y. County Nov. 7, 2012) (denying motion to vacate temporary restraining order ("TRO") and converting previously issued TRO into a preliminary injunction).

The City faces a substantial threat of irreparable injury to its reputation if Defendants are not enjoined from transferring, selling, disposing of, or in any way disseminating and/or distributing the content without applying the redactions and removals from the footage requested by the City. Pursuant to the Contract, the City requested redactions and removals from video footage.[42] If released without the City's contractually-mandated edits, the footage would pose a threat to the life and safety of the individuals depicted including NYPD undercover officers,

---

[42] Martinez Aff. ¶¶ 33-35, 50-52; Complaint ¶¶ 31, 33, 56, 64.

uniformed officers, their family members, arrestees, detainees, civilian witnesses and victims, and juvenile arrestees who are accorded a higher level of protection.[43] As far as the City is aware, none of these individuals provided consent for their likeness to be publicly disseminated, as required by paragraph 5 of the Contract.[44]  Any dissemination of this footage would be not only be highly problematic, but could threaten to interfere with law enforcement investigations, judicial proceedings, deprive numerous arrestees' rights to a fair trial, and cause significant harm to the City and the Department as it would undoubtedly tarnish its reputation and goodwill.

McGraw Media expressly recognized this evident threat of irreparable injury, as it memorialized in the Contract that it "acknowledges that the unauthorized use of NYPD Property will cause irreparable harm to the City for which there is no adequate remedy at law, and that the City shall be entitled to injunctive or other equitable relief restraining such unauthorized use in addition to any other remedies available at law or in equity."[45]  Accordingly, McGraw Media agreed to not use the NYPD name "in connection with any illegal or immoral purpose or activity, or in any manner which would be damaging to the City's name and reputation."[46] *See Vector Media, LLC v. Go New York Tours Inc.*, 187 A.D.3d 531, 531 (1st Dep't 2020) (affirming grant of preliminary injunctive relief even where the parties disputed whether there was irreparable harm because the "parties explicitly agreed in the contract that if defendant breached or threatened to breach, plaintiff's damages would be irreparable and that injunctive relief would be appropriate"). If the At-Issue Assets were disseminated, transferred and/or sold without the requested redaction

---

[43] Ex. A, Contract ¶ 6.

[44] Martinez Aff. ¶ 40.

[45] Ex. A, Contract ¶ 11.

[46] *Id.*

or removal, it is not only reasonably foreseeable that the lives and safety of those identifiable from the video footage could be jeopardized, but also that public confidence in the City and the NYPD would be tarnished, such that any amount of monetary damages would not be an adequate remedy.

In addition, paragraph 6 of the Contract expressly grants the City the right to review and comment on the video for purposes of identifying any portions that "the City is legally prohibited from releasing." Public Officers Law § 87(2)(f) permits the City to deny access to records, where the records, if disclosed, would endanger the life or safety of any person. In the civil litigation context, the City only needs to demonstrate "a possibility of endanger[ment]" in order to invoke this exemption[.]  *See Matter of Connolly v. New York Guard*, 175 A.D.2d 372, 373 (3d Dep't 1991) (preventing reporter's access to records that could possibly endanger the life and safety of Guard members or others, including materials that include methods used to communicate in the event of mobilization, procedures, identification code words, method and procedures relating to security, intelligence, and counterintelligence); *see also Matter of Rodriguez v. Johnson*, 66 A.D.3d 536, 536 (1st Dep't 2009) (preventing the disclosure of documents pertaining to criminal prosecution); *Matter of Bellamy v New York City Police Dept.*, 59 A.D.3d 353, 355 (1st Dep't 2009) (explaining that considerations underlying section 87(2)(f) requires a court to consider whether the information sought to be withheld could endanger the life and safety of witnesses or have a chilling effect on future witness cooperation) (internal citation omitted).

Threats to the safety of NYPD officers and their families are real, and undercover officers face even greater threats when their identities are revealed.[47] There are numerous examples of undercovers being assaulted, threatened at gunpoint during operations, and even murdered.

---

[47] Martinez Aff. ¶¶ 38, 64.



Because undercovers often work alone, they operate in environments where they are at a tactical disadvantage.[48] Despite all this, our undercovers bravely protect the public to prevent acts of terrorism, remove illegal arms and narcotics dealers from the streets, and save victims of human trafficking.[49] The harm to the public if the NYPD undercover program is compromised cannot be overstated – the lives of our officers and their families, and the safety of the City are all at stake.

Here, where there is a potential for full public dissemination of the episodes on television or other digital media, there is an even greater risk that airing such content without any edits could pose a direct threat to the life and safety of the undercover officers, civilian witnesses and victims, and threatens to jeopardize the active confidential and sensitive police operations and investigations.

Absent interim relief, actual and imminent injury will result.

C.    A Balancing of the Equities Weighs Decisively in Favor of the City

A balance of the equities weighs decisively in favor of the City. *See, e.g.*, *Asprea v. Whitehall Interiors NYC, LLC*, 206 A.D.3d 402, 403 (1st Dep't 2022) (balance of equities favored movant as the counter-movant "is enjoined only from conducting business that would likely be in violation of the parties' agreements[]"). In balancing the equities, "a court must determine whether the alleged irreparable injury to be sustained by the plaintiff[] is more burdensome to them than the harm caused to the defendants through the imposition of the injunction." *Due Peci, Inc. v. Von Vonni Inc.*, 2012 N.Y. Misc. LEXIS 6866, at *13 (Sup. Ct., N.Y. County Mar. 23, 2012).

---

[48] *Id.* ¶ 38.

[49] Martinez Aff. ¶¶ 38, 64.

Case 1:26-cv-00598    Document 1-1    Filed 01/22/26    Page 84 of 92

Here, the City has established that denial of injunctive relief would subject the City and the public to irreparable harm, and such irreparable harm was expressly acknowledged by Defendants in the Contract to directly result from any unauthorized use of NYPD property. Defendants agreed that, accordingly, "the City *shall be entitled* to injunctive or other equitable relief restraining such unauthorized use in addition to any other remedies available at law or in equity."  By contrast, an injunction maintaining the status quo while the Court determines the merits of the City's claims would not harm Defendants.  Indeed, if a temporary restraining order is granted, the only potential harm that would befall Defendants would be a brief delay to any potential transfer of the At-Issue Assets pending hearing on the instant motion.  Such a transfer or sale is without City consent and, in any event, would violate the express terms of the Contract.[50] Moreover, a preliminary injunction will simply maintain the status quo while the litigation is pending.

Accordingly, the City's application should be granted in its entirety.

## CONCLUSION

For the foregoing reasons, the City is entitled to a temporary restraining order and a preliminary injunction enjoining Defendants from taking any action with respect to any video footage pertaining to the digital project entitled "Behind the Badge" including transferring, selling, disposing of, or in any way disseminating and/or distributing the content, and for such other and further relief as this Court may deem just and proper.

---

[50] Ex. A, Contract ¶ 13.

Dated:     New York, New York
            January 21, 2026

                    MURIEL GOODE-TRUFANT
                    Corporation Counsel of the City of New York
                    Attorney for the City of New York
                    100 Church Street, 3rd Floor
                    New York, New York 10007

By: _____
                    Elisa Lee
                    Maxwell Canty-Hilchey (not yet admitted)
                    Assistant Corporation Counsel

## **WORD COUNT CERTIFICATION**

Pursuant to 22 NYCRR 202.8-b, I certify that the preceding document contains 5,222 words (excluding the Table of Contents, Table of Authorities, caption and signature block), and complies with the applicable word count limit. In making this certification, I have relied on the word count of the processing system used to prepare the document.

Dated:      New York, New York
              January 21, 2026

                                              /s/ *Elisa Lee*

                                          Elisa Lee

                                          Assistant Corporation Counsel



**T**HE **C**ITY OF **N**EW **Y**ORK
# LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, NY 10007

**MURIEL GOODE-TRUFANT**
*Corporation Counsel*

**ELISA LEE**
phone: 212-356-2328
fax: 212-356-2088
email: ellee@law.nyc.gov

January 21, 2026

New York County Clerk's Office
Supreme Court of the State of New York, County of New York
Submissions Part, Room 130
60 Centre Street
New York, New York 10007

Re:  The City of New York v. McGraw Media, Inc., et al.,
Index No. _____/2026

Dear Sir/Madam:

The Corporation Counsel is exempt from any payment of fees, court costs, or certification costs relating to the filing or transfer of an action, and any fees for the issue of an index number, perfection of an appeal, request for judicial intervention, or any other court fee relating to the defense of an action against the municipality of New York. See CPLR Section 8019(d); Section 7-102 of the Administrative Code of the City of New York.

Accordingly, please accept the enclosed papers without payment of fees.  Thank you for your attention to this matter.

Sincerely yours,

MURIEL GOODE-TRUFANT
Corporation Counsel

By:  _/s/ Elisa Lee_____
ELISA LEE
Assistant Corporation Counsel

Encl.

# 0085

UCS-840
(rev. 12/16/2024)

# REQUEST FOR JUDICIAL INTERVENTION



### Supreme COURT, COUNTY OF New York

Index No: _____    Date Index Issued: _____

| | For Court Use Only: |
|---|---|

**CAPTION**    Enter the complete case caption. Do not use et al or et ano. If more space is needed, attach a caption rider sheet.

The City of New York

IAS Entry Date

Plaintiff(s)/Petitioner(s)

Judge Assigned

-against-

McGraw Media, Inc., Jordan McGraw, Behind the Badge LLC, John and Jane Does 1-20

RJI Filed Date

Defendant(s)/Respondent(s)

---

**NATURE OF ACTION OR PROCEEDING:**    Check only one box and specify where indicated.

**COMMERCIAL**
- ☐ Business Entity (includes corporations, partnerships, LLCs, LLPs, etc.)
- ☒ Contract
- ☐ Insurance (where insurance company is a party, except arbitration)
- ☐ UCC (includes sales and negotiable instruments)
- ☐ Other Commercial *(specify):* _____

*NOTE: For Commercial Division assignment requests pursuant to 22 NYCRR 202.70(d), complete and attach the **COMMERCIAL DIVISION RJI ADDENDUM (UCS-840C)**.*

**TORTS**
- ☐ Asbestos
- ☐ Environmental *(specify):* _____
- ☐ Medical, Dental or Podiatric Malpractice
- ☐ Motor Vehicle
- ☐ Products Liability *(specify):* _____
- ☐ Other Negligence *(specify):* _____
- ☐ Other Professional Malpractice *(specify):* _____
- ☐ Other Tort *(specify):* _____

**SPECIAL PROCEEDINGS**
- ☐ Child-Parent Security Act *(specify):* ☐ Assisted Reproduction ☐ Surrogacy Agreement
- ☐ CPLR Article 75 - Arbitration    [see *NOTE* in **COMMERCIAL** section]
- ☐ CPLR Article 78 - Proceeding against a Body or Officer
- ☐ Election Law
- ☐ Extreme Risk Protection Order
- ☐ MHL Article 9.60 - Kendra's Law
- ☐ MHL Article 10 - Sex Offender Confinement *(specify):* ☐ Initial ☐ Review
- ☐ MHL Article 81 (Guardianship)
- ☐ Other Mental Hygiene *(specify):* _____
- ☐ Other Special Proceeding *(specify):* _____

**MATRIMONIAL**
- ☐ Contested

    *NOTE: If there are children under the age of 18, complete and attach the* ***MATRIMONIAL RJI Addendum (UCS-840M)***.

    *For Uncontested Matrimonial actions, use the Uncontested Divorce RJI (**UD-13**).*

**REAL PROPERTY** Specify how many properties the application includes: _____
- ☐ Condemnation
- ☐ Mortgage Foreclosure *(specify):* ☐ Residential ☐ Commercial

    Property Address: _____

    *NOTE: For Mortgage Foreclosure actions involving a one to four-family, owner-occupied residential property or owner-occupied condominium, complete and attach the* ***FORECLOSURE RJI ADDENDUM (UCS-840F)***.
- ☐ Partition

    *NOTE: Complete and attach the **PARTITION RJI ADDENDUM (UCS-840P)**.*
- ☐ Tax Certiorari *(specify):* Section: _____ Block: _____ Lot: _____
- ☐ Tax Foreclosure
- ☐ Other Real Property *(specify):* _____

**OTHER MATTERS**
- ☐ Certificate of Incorporation/Dissolution    [see *NOTE* in **COMMERCIAL** section]
- ☐ Emergency Medical Treatment
- ☐ Habeas Corpus
- ☐ Local Court Appeal
- ☐ Mechanic's Lien
- ☐ Name Change/Sex Designation Change
- ☐ Pistol Permit Revocation Hearing
- ☐ Sale or Finance of Religious/Not-for-Profit Property
- ☐ Other *(specify):* _____

---

**STATUS OF ACTION OR PROCEEDING**    Answer YES or NO for every question and enter additional information where indicated.

| | YES | NO | |
|---|---|---|---|
| Has a summons and complaint or summons with notice been filed? | ☐ | ☒ | If yes, date filed: _____ |
| Has a summons and complaint or summons with notice been served? | ☐ | ☒ | If yes, date served: _____ |
| Is this action/proceeding being filed post-judgment? | ☐ | ☒ | If yes, judgment date: _____ |

---

**NATURE OF JUDICIAL INTERVENTION**    Check one box only and enter additional information where indicated.

- ☐ Infant's Compromise
- ☐ Extreme Risk Protection Order Application
- ☐ Note of Issue/Certificate of Readiness
- ☐ Notice of Medical, Dental or Podiatric Malpractice    Date Issue Joined: _____
- ☐ Notice of Motion    Relief Requested: _____    Return Date: _____
- ☐ Notice of Petition    Relief Requested: _____    Return Date: _____
- ☐ Order to Show Cause    Relief Requested: _____    Return Date: _____
- ☒ Other Ex Parte Application    Relief Requested: Injunction/Restraining Order
- ☐ Partition Settlement Conference
- ☐ Request for Preliminary Conference
- ☐ Residential Mortgage Foreclosure Settlement Conference
- ☐ Waiver of Court Costs, Fees and Expenses
- ☐ Writ of Habeas Corpus
- ☐ Other *(specify):* _____

0086

Case 1:26-cv-00598 Document 1-1 Filed 01/22/26 Page 89 of 92

| RELATED CASES | List any related actions. For Matrimonial cases, list any related criminal or Family Court cases. If none, leave blank. If additional space is required, complete and attach the **RJI Addendum (UCS-840A)**. | | | |
|---|---|---|---|---|
| Case Title | Index/Case Number | Court | Judge (if assigned) | Relationship to instant case |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| PARTIES | | For parties without an attorney, check the "Un-Rep" box and enter the party's address, phone number and email in the space provided. If additional space is required, complete and attach the **RJI Addendum (UCS-840A)**. | | |
|---|---|---|---|---|
| Un-Rep | **Parties** List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant, 3rd party plaintiff, etc.) | **Attorneys and Unrepresented Litigants** For represented parties, provide attorney's name, firm name, address, phone and email. For unrepresented parties, provide party's address, phone and email. | **Issue Joined** For each defendant, indicate if issue has been joined. | **Insurance Carriers** For each defendant, indicate insurance carrier, if applicable. |
| ☐ | Name: The City of New York<br><br>Role(s): Plaintiff/Petitioner | ELISA LEE, New York City Law Department, 100 Church Street 3rd Floor, New York, NY 10007, (212) 356-2328, ellee@law.nyc.gov | ☐ YES ☒ NO | |
| ☒ | Name: McGraw Media, Inc.<br><br>Role(s): Defendant/Respondent | 4245 Kemp Boulevard, Suite 406, Wichita Falls, TX 76308 | ☐ YES ☒ NO | |
| ☒ | Name: McGraw, Jordan<br><br>Role(s): Defendant/Respondent | 4245 Kemp Boulevard, Suite 406, Wichita Falls, TX 76308 | ☐ YES ☒ NO | |
| ☒ | Name: Behind the Badge LLC<br><br>Role(s): Defendant/Respondent | 1400 11th Street, Wichita Falls, TX 76301 | ☐ YES ☒ NO | |
| ☒ | Name: John and Jane Does 1-20<br><br>Role(s): Defendant/Respondent | | ☐ YES ☒ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES ☐ NO | |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, UPON INFORMATION AND BELIEF, THERE ARE NO OTHER RELATED ACTIONS OR PROCEEDINGS, EXCEPT AS NOTED ABOVE, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION BEEN PREVIOUSLY FILED IN THIS ACTION OR PROCEEDING.**

Dated: 01/21/2026

_____ ELISA LEE
_____
Signature

_____5285531_____ ELISA LEE
_____
Attorney Registration Number Print Name

## 0087

E

At Part _52_ of the Supreme Court of the
County of New York, held at ~~60~~ 111 Centre Street
at the Supreme Courthouse in the City of
New York, New York, on the 21st day of
January, 2026.

PRESENT: Hon. ___HON. CAROL SHARPE___ , Justice

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------ X

THE CITY OF NEW YORK,

                           Plaintiff,

            -against-

MCGRAW MEDIA, INC., JORDAN MCGRAW,
BEHIND THE BADGE LLC, and JOHN AND JANE
DOES 1-20,

                         Defendants.

------------------------------------------------------------------ X

**~~[PROPOSED]~~ ORDER WITH
TEMPORARY RESTRAINING
ORDER**

Index No. 450505/2026

MS# 1 Injunction

       **UPON** the reading and filing of the accompanying affirmation of Elisa Lee, an Assistant
dated January 21, 2026
Corporation Counsel (the "Lee Affirmation") and Affidavit of Luis Martinez, Special Advisor to
dated January 21, 2026
the Commissioner of the New York City Police Department ("NYPD") (the "Martinez Affidavit"),
and memorandum of law in support, together with all the supporting papers annexed hereto, and

upon all the prior papers and proceedings in this action,

       **LET** the above named Defendants or their attorneys, **SHOW CAUSE** at a term, IAS Part
111
_52_ Room _1045_ , to be held at the Courthouse, ~~60~~ Centre Street, New York, New York
13
100~~07~~, on the _23rd_ day of _January_ , 2026, at _10:30_ o'clock of that day or as soon

thereafter as counsel can be heard,

       **WHY** an Order should not be made:

J.S.C.

0088

1. Preliminarily enjoining Defendants and anyone acting on their behalf from transferring, selling, disposing of, or in any way disseminating and/or distributing any video footage pertaining to the digital project entitled "Behind the Badge" (the "Project") involving numerous members of service of the NYPD without first removing the Non-Usable Content and Vetoed Material as identified by the City; and

2. Pursuant to 22 NYCRR § 216.1, ordering that future filings by any party in the above-captioned action to the extent they contain, describe or otherwise reference Non-Usable Content or Vetoed Material as described in the Contract be redacted and/or filed under seal; and it is further

**ORDERED** that pending the hearing of this motion, that Defendants and anyone acting on their behalf are temporarily **STAYED** and **RESTRAINED** from acting in any way to transfer and/or sell and/or distribute and/or disseminate video footage pertaining to the Project without first removing the Non-Usable Content and Vetoed Material as identified by the City;

**FURTHER ORDERED** that pending the hearing of this motion, that parties seeking to submit the video footage and any descriptions or references of Non-Usable Content or Vetoed Material as previously identified by the City to the Court shall redact such information or submit it under seal; and

SUFFICIENT ~~REASONING APPEARING THEREFORE~~, CAUSE BEING ALLEGED it is ORDERED that let service of a copy of this Order to Show Cause, together with the papers upon which it is based, be made upon Defendants by ~~overnight mail~~ email on or before January 22 no later than 1:00pm , 2026; and it is further

**ORDERED** that all answering papers, if any, shall be served on the Office of the Corporation Counsel, 100 Church Street, 3rd Floor, New York, New York 10007, with a copy to

J.S.C.

the Court so as to be received by said attorneys on ~~or before~~ January 23 rd , 2026. *no later than 10:00 am*

~~Reply papers shall be served on or before~~ _____, 2026.

Oral Argument
Directed

JSC

ENTER:

_____
Justice

HON. CAROL SHARPE
J.S.C.

Index No. 450505/2026

0090

3